```
 1   UNITED STATES DISTRICT COURT

 2   DISTRICT OF CONNECTICUT

 3
     UNITED STATES OF AMERICA,    )
 4                  Plaintiff,    )    NO: 3:19MJ1708(RMS)
                                  )
 5   vs.                          )
                                  )    February 13, 2020
 6   AHMAD KHALIL ELSHAZLY,       )
                    Defendant.    )    Bond Hearing
 7   _____ )

 8
                            141 Church Street
 9                      New Haven, Connecticut

10   B E F O R E:
             THE HONORABLE ROBERT M. SPECTOR, U.S.M.J
11
     A P P E A R A N C E S:
12
     For the Plaintiff :         DOUGLAS P. MORABITO, AUSA
13                               United States Attorney's Office
                                 157 Church Street, 25th Floor
14                               New Haven, CT 06510

15   For the Defendant:          JAMES P. MAGUIRE, ESQ.
                                 Federal Public Defender's Office
16                               265 Church Street, Suite 702
                                 New Haven, CT 06510

17

18

19

20

21

22

23
     Transcriber:                Martha C. Marshall, RMR, CRR
24

25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

1          THE COURT:  Good morning.  You may be seated.

2          MR. MORABITO:  Good morning, Your Honor.

3          THE COURT:  We're here in the case of United States

4   of America versus Ahmad Elshazly.  The case number is

5   3:19MJ1708.

6          Could I please have appearances of counsel and

7   anyone seated with you at counsel table.

8          MR. MORABITO:  Good morning, Your Honor.  Doug

9   Morabito on behalf of the Government.  At counsel table is

10  Special Agent Brett Healey from the FBI.

11         THE COURT:  Good morning.  Good morning to you both.

12         MR. MAGUIRE:  Good morning.  James Maguire on behalf

13  of Ahmad Elshazly.  With me at counsel table is Mr. Elshazly.

14  We're joined as well by Mr. Elshazly's family or some members

15  of them, notably including his mother, his father, and his

16  aunt, all of whom are the proposed co-signers.

17         THE COURT:  Good morning.  Good morning to you both,

18  and to Mr. Elshazly and his family.

19         Before we turn to the primary reason we're here

20  which is to consider the defendant's motion for release on

21  bond, I just want to address one other issue so I don't

22  forget.

23         There was a notice filed on the docket about a

24  protective order.  It wasn't docketed as a motion so it did

25  not get addressed.  It seems to contemplate the Court signing

1    the stipulation or so ordering it.  And before I did that, I

2    just wanted to check first with Attorney Morabito if that's

3    what I'm supposed to be doing.  Was it intended to be a

4    request for the Court to sign that?

5              MR. MORABITO:  It was, Your Honor.  I apologize.

6              THE COURT:  That's okay.

7              MR. MORABITO:  In the past I've done them, we've

8    filed them.  But, in retrospect, we've had conferences with

9    the Court about the protective order so when it was filed the

10   court would know.  So that was our intention.  I can make an

11   oral motion now for the Court to --

12             THE COURT:  That would be great.

13             MR. MORABITO:  So I orally request or, with consent

14   of Mr. Maguire on behalf of the defendant, that the Court

15   enter the protective order so that the Government can start

16   to produce some preindictment discovery to the defendant and

17   his counsel.

18             THE COURT:  All right.  And, Attorney Maguire,

19   what's your view on that request?

20             MR. MAGUIRE:  We believe the protective order at

21   this point is appropriate.  I will note that because this is

22   a preindictment case, there is not yet the standing order

23   that is normally in place providing a right to and certain

24   limitations on discovery.  I think for the moment this

25   protective order accomplishes those goals.  I will note the

1   protective order does contemplate that in the future should

2   there be a concern by either party with the nature of the

3   order, we do have an opportunity to come back to court

4   requesting a modification.  And so we do consent.

5           THE COURT:  All right.  And so the document that's

6   been filed as document number 15, filed on February 5th,

7   you've reviewed that and you have no objection to the Court

8   granting that?

9           MR. MAGUIRE:  That's correct.

10          THE COURT:  So I will ask my Courtroom Deputy to

11  enter my signature on the protective order as -- it's on page

12  five, and I will so order it as of today.

13          So now we're going to turn to the reason we're here

14  which is the Motion for Release on Bond which was filed on

15  February 7th, 2020.  I received a Pretrial Services Report

16  from Probation Officer Lauren Hart.  And I should have the

17  United States Probation Officer who is here for Ms. Hart

18  identify herself.

19          MS. MELENDEZ:  Desiree Melendez with U.S. Probation.

20          THE COURT:  Thank you for being here.

21          The report was dated February 11th.  And I want to

22  make sure both sides have received a copy.

23          Attorney Maguire, have you received a copy of that

24  report?

25          MR. MAGUIRE:  I have.  And I've reviewed it with

1   Mr. Elshazly.

2           THE COURT:  Is there any information in the report

3   that's either inaccurate or incomplete?

4           MR. MAGUIRE:  There is not.  I'll note that

5   Mr. Elshazly's first name is missing on the cover page, but I

6   don't think that's a substantive issue.

7           THE COURT:  Okay.  Thank you.

8           Attorney Morabito, have you received a copy of the

9   report?

10          MR. MORABITO:  I have, Your Honor.  And I have

11  reviewed it as well.  I have nothing to add to it.

12          THE COURT:  All right.  So neither side has any

13  objection to me relying on the factual information that's

14  contained in the report?

15          MR. MORABITO:  No, Your Honor.

16          THE COURT:  All right.  So, Attorney Maguire, I'm

17  going to turn it over to you to make whatever arguments You'd

18  like to make in support of your request.  I have reviewed

19  your request and that was filed as document number 17.  I

20  think you're requesting that the defendant be released into

21  the custody of his maternal aunt and at I presume her

22  address, that he be placed on GPS location monitoring, and

23  placed in home confinement.  That he not have access to any

24  internet enabled devices.  And that any bond be co-signed

25  by -- obviously, by him, his aunt, and both of his parents.

1    I think I've summarized your proposal.

2           MR. MAGUIRE:  You have.  And certainly what I'd like

3    to do in part is flush out a little bit of the details of

4    that again, understanding it was sort of a fairly

5    straightforward proposal and I do think there's some

6    important factual features that I want to elaborate on.

7           But I do want to start, as we just noted, we've

8    reviewed the Pretrial Services Report which we understand

9    recommends here detention.  I think it's a relatively unusual

10   situation where, frankly, the thing that jumps out is a

11   notation of extremely concerning offense conduct as what

12   appears to be driving the Pretrial Services Report

13   recommendation.  That's usually not what Pretrial Services is

14   looking at.  It's also, frankly, quite unusual for me to be

15   standing here with, I can't quite count them, not quite a

16   dozen FBI agents sitting in the courtroom with us.

17          And so I want to begin by saying something that as a

18   formal matter I think we all understand, which is that the

19   nature of this charge, while serious and certainly one that

20   triggers a presumption, a rebuttable presumption of

21   detention, also touches a political and psychological third

22   rail.  That it is the sort of charge that evokes, frankly,

23   emotional feelings about cases that are not this case, about

24   people that are very different from Mr. Elshazly, but that do

25   loom large in all of our imaginations in the way that many

1    and, frankly, nearly all other cases don't, even cases that

2    are by their nature very serious.  And so I want to begin by

3    saying, as the Court well knows, the questions here are not

4    about those broader political emotional issues.  They are

5    about a set of very concrete and, frankly, narrow questions

6    for the Court, which are whether Mr. Elshazly, if released,

7    and released under the conditions we propose, poses a risk of

8    non-appearance or a risk to the community that is such that

9    there are no conditions that can be imposed to assure his

10   release.  And, again, I don't actually think it's possible to

11   completely get past that emotional reality, but I'm flagging

12   it in an effort to do so.

13         I think where I'll begin, though, is by outlining a

14   little bit more what we do have in mind, because this is a

15   case that it came in December, Mr. Elshazly's now been in

16   custody for a couple of months at this point, and we've

17   carefully sat back and thought what would be appropriate

18   conditions.

19         For essentially most nearly all of his life,

20   Mr. Elshazly's been living with his mother.  He spent some

21   short period of time in Maryland living with his father, but

22   essentially for his entire life he has been a Connecticut

23   resident living here with his mother.  He's someone, as the

24   Court knows, who has no criminal record.  He's also someone

25   who, frankly, hasn't done a whole lot with his life.  That

1    the biggest thing that sticks out about Mr. Elshazly is sort
2    of not what he has done that poses a risk of him acting or
3    leaving or doing anything, but that he actually hasn't done
4    very much at all.  There's sort of a failure to launch.  And
5    I've spoken to his mother about this.  I've spoken to Ahmad
6    about this.  I've spoken to his father and as well to his
7    Aunt Jamana (ph).  Because while this passivity does not
8    actually raise a risk essentially of Mr. Elshazly doing
9    something, in fact, it suggests he may do nothing at all, it
10   is something that was a concern raised by all of his family.
11            And so we are not suggesting that Mr. Elshazly
12   simply return to the status quo.  And we understand that the
13   allegations here include that Mr. Elshazly was allegedly
14   accessing the internet and engaged in behavior that is
15   problematic and concerning, if true, and that this was
16   something that would have been under the eye of his mother.
17   And we are not proposing simply that he return to those
18   circumstances.  Instead, what we're proposing is that he have
19   a pretty radical shift in his home life.  Very much unlike
20   his mother who, according to her own conversation with me as
21   well as his relatives, is someone who is frankly a soft
22   touch.  Someone who has not monitored Ahmad.  Someone who has
23   let him do what he would want to do.  And, frankly, has not
24   clearly pushed him into education and into an active place in
25   the world.  His aunt, who is happy to speak to the Court,

1    that may make sense, is someone who is very different.

2    Someone who, by his father's account, by her account, by his

3    mother's account, is very strict.  She, frankly, doesn't see

4    eye to eye I think on a lot of things with Ahmad's mother.

5    And one of her conditions of release is actually that Ahmad

6    live with her and, at least for a period of time, have little

7    or no contact with his mother.  Not because she poses some

8    sort of risk, but that she wants to ensure that her rules,

9    and her very strict rules, are followed and that Ahmad has

10   only her to look to.  That is a proposal that his father also

11   echoes as something that is appropriate.

12          Under her roof, the Court can order that

13   Mr. Elshazly essentially stay under her roof.  Options short

14   of outright detention include up to and including home

15   detention or, rather, home incarceration, which would not let

16   him leave for any reason.

17          THE COURT:  Can you -- I hate to interrupt, but what

18   was her relationship with the defendant prior to this

19   offense?

20          MR. MAGUIRE:  So they, obviously, are relatives.

21   What I would say is that her relationship was not a

22   particularly close one in the sense that she would sometimes

23   be present at the home.  But I understand that she was not

24   sort of someone who would have been there every day or even

25   every week.  Not someone who would have had a chance to

1    observe in the way that his mother would have.

2            THE COURT:  How often would she have seen him?

3            MR. MAGUIRE:  You know, I believe, and I will

4    confirm, I want to say that the right estimate is about once

5    a month.

6            I am told that I am correct.

7            Another thing that I will note that is --

8            THE COURT:  I guess to me that poses some issues,

9    right.  I mean, we're talking -- we've mentioned, I'm sure

10   Attorney Morabito will get into more detail, but let's just

11   assume for the sake of argument that we're talking about very

12   serious offense conduct.  We're talking about placing him in

13   the custody of somebody who prior to that really had no

14   involvement in his life in a way that would mean she would

15   have authority over him.  That's the part I don't understand.

16   In other words, the idea that she would have strict rules and

17   that she runs her house differently doesn't mean very much to

18   the Court if she didn't have that kind of relationship with

19   the defendant prior to his arrest.  Because how am I supposed

20   to know whether the defendant would abide by whatever she

21   says if he didn't have a prior relationship with her?

22           MR. MAGUIRE:  So what I think is that part of the

23   answer is one about Court conditions.  Part of the answer,

24   though, that I'll talk about first is I think about family

25   structure.  That she has been someone who has not been

1   directly in the place of being his mother.  She is someone

2   who is relative to him, someone in a place of authority as

3   his aunt.  She has had a conversation.  She has gone to

4   Wyatt.  What she wanted to do is make sure that before she

5   said yes, I'm willing to have Ahmad live with me, she wanted

6   to go and visit him and speak to him and confirm that he is,

7   in fact, willing to obey all of her rules.  And so they have

8   absolutely a relationship that is, again, one of her being a

9   person potentially in authority as his aunt.  Are they --

10  again, she has not been someone who has been there watching,

11  but I think she certainly is in that role, relatively

12  speaking, as an available authority.

13          THE COURT:  Does she understand the nature of the

14  offense and the allegations in the case?

15          MR. MAGUIRE:  She does.

16          THE COURT:  And what should I take from the fact

17  that you're not proposing his parents as third party

18  custodians?

19          MR. MAGUIRE:  So what I would say is that we

20  considered his father.  And his father is someone who would

21  be available as a third party custodian.  It's something that

22  he is absolutely willing to do, and I think it would be a

23  placement that wouldn't be inappropriate.  The downside is he

24  lives in Frederick, Maryland, which would create, frankly,

25  some significant logistical difficulties.  In some ways

1    even -- yes, that it would create logistical difficulties I'm

2    sure for supervision and arranging, you know, for ensuring

3    that Maryland would be willing to, but also creating problems

4    for preparing a defense.  This is a case in which I'm told

5    there are, you know, I think it's 50 hours of audio

6    recordings and I'm sure voluminous other discovery that would

7    have to review with Mr. Elshazly.  If that were something

8    that the Court were to say I'm comfortable with him living

9    with his father, but not with his aunt, that is something

10   that his father is absolutely willing to do.  It is something

11   that Mr. Elshazly himself is willing to do.  Just because his

12   aunt is here in Connecticut and his father agreed she would

13   be an appropriate custodian, that's really why we haven't

14   proposed that.

15           In addition, just as sort of a smaller note on the

16   logistics, I spoke to his aunt today and she confirmed

17   actually, without my prompting, that she has gone out and

18   gotten a non-smart phone.  She does have password protected

19   internet in her house, but she would be willing, if that's

20   what it took, to essentially turn off all of the internet in

21   the house so that there would not even be that remote

22   possibility of Mr. Elshazly accessing the internet.  She is

23   someone who, frankly, cares very deeply about Ahmad.  And

24   despite the fact that her children are now grown and she has

25   the house essentially to herself, she's willing to take on

1    what she understands is a great burden.

2          I do think, too, and this starts getting us into

3    some of what's charged in the offense conduct, is the

4    internet access piece is important partly because, again, the

5    nature of this charged offense is not actually that

6    Mr. Elshazly is part of some network of people that exist

7    that could in any practical way assist him if he were, say,

8    to have a future desire to leave the country.  It appears,

9    rather, from the charged offense, that the people he was

10   interacting with were, in fact, either FBI agents or

11   informants or otherwise working through the Government.  That

12   it was, frankly, the Federal Government that made it possible

13   for Mr. Elshazly to get as far as he allegedly did.  That

14   this isn't a case of, as is the case very often, that the

15   Court's question is if I return this person to the community,

16   who are the person's neighbors, who are their friends, who

17   are their family, who are the people that they could very

18   easily be around that would enable or provoke or otherwise

19   create problems.  But the reality here is Mr. Elshazly's

20   family very much the opposite, is a source of support and

21   discipline, but not at all involved in the events, nor,

22   frankly, are people that he'd be surrounded by.  And that way

23   he even, if released, even if you assume the complaint

24   allegations are true, far more isolated from any other

25   individuals than would be the typical defendant released into

1    the community.

2          The concern that the Government raises in the

3    complaint relates to the internet.  And that can be

4    addressed, again, by preventing Mr. Elshazly from accessing

5    the internet.  And this is, yes, accomplished partly through

6    the oversight of his aunt, partly through the

7    non-availability of devices, partly through GPS location

8    monitoring where the Court can assure that if the Court's

9    decision today is Mr. Elshazly can be released but only on

10   home incarceration, you can have absolute assurance of

11   exactly where he is 24 hours a day, because that is how GPS

12   works.

13         THE COURT:  Right.  But it's not as if Mr. Elshazly

14   left his home the Probation Officer would get a sudden

15   notification and run out to the residence.  That's not how it

16   works.  It's meant as a backup measure to alert the Probation

17   Office of non-compliance after the non-compliance happens.

18   Not to prevent it.

19         MR. MAGUIRE:  So I think that certainly the alert

20   would be immediate.  Normally we don't have quite such a

21   Government presence.  I don't know what the reality is if

22   Mr. Elshazly were to walk out the door but --

23         MR. MORABITO:  Well, I mean, the Government presence

24   is irrelevant, right?  They don't work for the court.  The

25   Probation Office is the office in charge of supervising

1    Mr. Elshazly.  So my only point is, you know, the best

2    indicator of whether somebody's going to violate is that

3    person, not the conditions.

4             So what can you tell me about Mr. Elshazly?  He's 22

5    years old?

6             MR. MAGUIRE:  He is.

7             THE COURT:  And he went through ninth grade in high

8    school?

9             MR. MAGUIRE:  That's right.

10            THE COURT:  I've read about his employment history

11   but, quite frankly, it's not very detailed.  What can you

12   tell me about the last job that he held?

13            MR. MAGUIRE:  So my understanding was the last job

14   that he held was working in a -- essentially for a bakery as

15   someone who was on the truck.

16            THE COURT:  And when was that?

17            MR. MAGUIRE:  And I think that was leading up to the

18   time of his arrest.

19            If I may have one moment?

20            THE COURT:  Sure.

21            MR. MAGUIRE:  I'm sorry, Mr. Elshazly's corrected

22   me.  He had been working for the bakery.  He then was working

23   in a food factory up to the time of his arrest.

24            The reality is --

25            THE COURT:  I'm sorry.  So in the Pretrial Services

1    Report, they reported that he worked for two months at Aurora

2    Foods.  So you're saying he worked for two months for Aurora

3    Foods leading up to his arrest?

4                MR. MAGUIRE:  That's right.

5                THE COURT:  And then prior to that he worked for

6    Bimbo Bread as a cashier and cook?

7                MR. MAGUIRE:  Correct.

8                THE COURT:  As a cashier and a cook at Greatway?  I

9    guess what I'm trying to do is I'm more interested in the

10   dates of employment than I am as to what he was doing.

11               MR. MAGUIRE:  Okay.  Mr. Elshazly said as months,

12   not quite a year.

13               THE COURT:  I'm sorry, say that again.

14               MR. MAGUIRE:  Less than a year, but a number of

15   months at Bimbo Bread before moving to Aurora Foods.

16               THE COURT:  I guess what I'm trying to find out is

17   when in terms of dates.  What we know is he's 22.  We know he

18   dropped out of high school in ninth grade.  I'm just trying

19   to fill in the gap of what happened between 9th grade and

20   today for employment, that's all.  So it could just be years.

21   I'm just trying to figure out when he worked at these places.

22               MR. MAGUIRE:  Sure.  And I think that this period of

23   time covers, at most, about a year going back.  But give me a

24   moment to confer.

25               THE COURT:  Sure.

1          MR. MAGUIRE:  So, again, there's additionally a

2    short period of time where he worked at 7-Eleven prior to

3    Bimbo Bread.  Prior to that he had been, as noted, I think in

4    the Pretrial Services Report, in Maryland for a period of

5    time where he was taking GED classes.  He didn't complete

6    those classes.

7          The reality here is that he has been financially

8    supported by his parents, you know, living principally with

9    his mother.  And I do note the Pretrial --

10         THE COURT:  I just don't want to assume something

11   without making sure it's correct.  What I gleaned from the

12   Pretrial Services Report is that he dropped out of high

13   school sometime, maybe eight years ago, I don't know if

14   that's correct, but seven or eight years ago.

15         MR. MAGUIRE:  So Mr. Elshazly has informed me that

16   in addition to the GED classes that he did in Maryland, there

17   was a short period that would have been in 10th grade when he

18   was in Maryland and taking classes.  And he did not actually

19   complete anything in Maryland.

20         THE COURT:  I'm just trying -- would that be 2011,

21   2012?

22         MR. MAGUIRE:  May I have one moment?

23         His father has helpfully informed me.  So 2013 would

24   have been his last schooling in Connecticut.  2014, he was

25   briefly in school in Maryland.  2016, he was back then

1   briefly in Maryland, I believe, for the GED period.

2        THE COURT:  So he dropped out of -- the dates are

3   going to be important so I don't want -- I'm not going to

4   move past this until I get the information.  I am not

5   faulting you in any way.

6        But I have a date of birth of 1997.  In 2013, that

7   would make him 16.  So I'm told he dropped out in 9th grade.

8   It's possible he was 16 in the 9th grade.  Probably not.  So

9   I'm just trying to understand the time between when he

10  dropped out of high school and today.  And what I

11  specifically want to understand is what he was doing.  It's

12  that simple literally.  So that's the part I'm just trying to

13  drill down on.

14       MR. MAGUIRE:  Okay.  And I did again, I just did

15  confirm with his father, that those were the dates.  I know

16  Mr. Elshazly had struggled previously in school.  We don't

17  yet have his education records.  Again, I'll glance back at

18  his father, but my understanding is, again, the final year at

19  Connecticut was 2013.  There's a brief period of education in

20  Maryland in 2014.  Again, the GED classes down in Maryland in

21  2016.  Then work --

22       THE COURT:  If we just look at the time period of

23  2014 to the present, the last five or six years, can you tell

24  me what he's been doing?

25       MR. MAGUIRE:  Hold on one moment.

1        So what I would say is that I do think the Court at

2    this point has -- does have a correct picture of what

3    Mr. Elshazly's doing out in the world.  What is he doing with

4    the rest of his time?  Obviously, there are obligations here.

5    An important piece of the reality is he's home playing video

6    games.

7        THE COURT:  I mean, I'm trying to sort of take the

8    information from the Pretrial Services Report which is in two

9    different categories.  One is sort of a description from his

10   mother about what he's been doing and the other is just a

11   description from himself about what he's been doing.  And it

12   sounds like what his mother said is accurate, is that he's

13   never really held a job for an extended period of time.  He

14   would work for two to three months and then get a job

15   elsewhere.  Does that sound about right?

16       MR. MAGUIRE:  It does.

17       THE COURT:  And so these jobs that are reported down

18   on the bottom of page two are jobs that he held for between

19   two or three months at a time.

20       MR. MAGUIRE:  And I believe the period at Bimbo

21   Breads was -- he recalls longer than two to three months.  It

22   was not a year, but it was, you know.

23       THE COURT:  Thank you.  I didn't mean to cut you

24   off.  I just couldn't understand that part.  Thank you.

25       MR. MAGUIRE:  Again, in part because the Court has

1    raised this, I will note that one of the things that

2    Probation points to as a concern is the lack of employment

3    here.  And I think that, again, in a different way than what

4    I opened with, this is a different sort of case that normally

5    comes before the courts, a different sort of case than I

6    think is contemplated in -- what goes into the Pretrial

7    Services algorithmic risk assessments.  That very often these

8    concerns about, well, what is someone's employment, what are

9    they doing, is are they on the street selling drugs, are they

10   engaged in other money making illegal activities.  Are they

11   otherwise sort of doing things, because we sort of assume

12   people are active and doing things, that pose a problem.  And

13   here I think that the reality and a concern that has been a

14   concern for Mr. Elshazly's family for some time is, as I kind

15   of described it earlier, a failure to launch.  That he should

16   have been out in the world doing things.  And, instead, he's

17   at home playing video games.  That is a lifestyle that was

18   enabled by his mother.  It's something you may say, well,

19   that's not ideal.  But that lifestyle, that does not raise

20   the sort of concerns for safety or for flight that I think

21   are implied in many other cases by a lack of employment.

22   Again, the question here is will Mr. Elshazly do something if

23   released.

24            THE COURT:  I mean, I think the point that is being

25   made in the Pretrial Services Report really goes to their

1    ability to supervise him.  And more specifically, if we had

2    somebody who had been employed steadily by the same company

3    for several years, what it would show is that you presume

4    that the company thought highly of him.  That he had a

5    reputation for being trustworthy, for showing up when he's

6    supposed to show up, for following the Court's directions.

7    And here we have quite the opposite, right?  We have somebody

8    who dropped out of high school in ninth grade.  Has not been

9    able to sort of follow through on that commitment.  And then

10   hasn't really held a job at all for any length of time in the

11   last five or six years.  And I'm not suggesting that I'm over

12   valuing that, but what I am suggesting is I think that's the

13   point that the Probation Officer is making, that the

14   employment history does not suggest somebody who has shown a

15   commitment, frankly, to a job or to schooling or to something

16   that would give you some guarantees that he would follow the

17   supervision of the Court I think is really the point.

18         MR. MAGUIRE:  So I think that certainly employment

19   could provide insight.  I disagree with the final kind of

20   conclusion there, particularly in the sense that if it were a

21   situation where I misrepresented that this person routinely

22   stole from a company or routinely disobeyed direct orders

23   despite the consequences, that that might provide a concern.

24   But the rules and requirements imposed by the Court here are

25   very different from do you have the initiative and follow

1    through to get and maintain employment.  I think they're just

2    categorically different.  And what is being asked of

3    Mr. Elshazly, if the Court releases him, particularly

4    releases him on very tight conditions, is don't do anything.

5    And that is very different from saying can you get yourself

6    out of bed reliably at 8 in the morning and organize your

7    life such that you are properly washed and dressed and you're

8    not rumpled and you get to work on time.

9            THE COURT:  But, certainly, if you had a full-time

10   employer sitting in the courtroom who had employed him prior

11   to his arrest and who was willing to bring him back for 40

12   hours a week, that would be something I think you would agree

13   could give the Court more assurances than if you didn't.

14           MR. MAGUIRE:  I think if I had that I would

15   certainly be asking for him to be out in the world for 40

16   hours a week.  Yes, I think -- again, I think that, yes,

17   employment could be a -- would be a positive thing, and is

18   something that has, yes, been missing from Mr. Elshazly's

19   life.  I just don't think it tells the Court that much about

20   the question of if he's ordered to stay at home and not

21   access the internet, is he going to do something different

22   than that.  I just don't think it provides much insight into

23   that.

24           And, again, this is a different sort of case because

25   the concern, from what I hear in Pretrial Services Report,

1   from everything else, isn't that Mr. Elshazly is someone who

2   poses any sort of immediate risk to the community.  That he's

3   not someone walking around causing substantial problems.

4   He's not someone who even has a minor criminal record.  That

5   the concern I think is raised by the offense conduct.  That

6   the concern is -- and I actually think probably the flight

7   and the danger concerns are kind of conflated in this sort of

8   case.  That Mr. Elshazly's not accused of doing anything to

9   harm anyone here in the United States.  He's accused of

10  trying to leave the country to engage in potentially a fight

11  in another country.  Frankly, a country far away with a very

12  complicated political situation.  But more importantly, I

13  think for today, not a country he could actually get to.  I

14  don't think there's -- and the Government will correct me and

15  tell me that there's a current operative channel from, you

16  know, Connecticut that it can reliably get you to Syria

17  through Turkey.  My understanding is, and understanding as

18  well the realities of what the Islamic state is and isn't at

19  this point, that's not realistic.

20          THE COURT:  You brought it up.  So let's talk about

21  it.  What's your view on what he actually did here?  Meaning

22  the efforts to -- it's been a while since I read the

23  complaint affidavit, but to essentially get on the boat.

24          MR. MAGUIRE:  So, again, we have no discovery.  And

25  so -- obviously, these are also allegations.  Not having seen

1   discovery, I don't think it is -- it's not something that I

2   think makes sense for me to get into.  I'm going to sort of

3   speak from a position of true limited knowledge.  I do think

4   and what I'll say is --

5         THE COURT:  One could argue, correct, that if in his

6   own mind he couldn't get on a plane, that if your argument is

7   correct, I assume your argument is going to be, I'm just

8   predicting the future, after I hear from Attorney Morabito,

9   I'm predicting the future that you're going to get up and say

10  he wasn't going to act on any of this stuff.  And the

11  Government presented this opportunity and he took it and so,

12  you know, you really can't fault him too much for that.

13        One of the responses I may hear from Attorney

14  Morabito would be, well, he had opportunities, a big one, to

15  just simply not follow through, because his excuse could have

16  simply been that he didn't think he could fly anywhere.

17  That's a pretty good excuse for not going anywhere, right,

18  especially someplace outside of the United States.  And so

19  the idea that he shows up on a dock to get on a boat might

20  undercut that argument.  That's my only question.

21        MR. MAGUIRE:  Sure.  And I think again, not having

22  seen the evidence, in this posture I actually don't think

23  that that prediction -- maybe because you said it I'm going

24  to say I was never going to say that.  I do think, though, an

25  important thing to say in response to that, that prediction,

1    is this is -- we're here on a detention hearing with a

2    forward looking question.  Although I'm not saying it's not

3    related, the question isn't precisely what would Mr. Elshazly

4    have done.  The question is what will Mr. Elshazly do.

5              THE COURT:  But in predicting or trying to figure

6    out the answer to that question don't we, by necessity, have

7    to look at what he has been doing over the last five or six

8    years?

9              MR. MAGUIRE:  And what I would say is that one of

10   the important things here is, yes, yes, you would look to

11   that.

12             THE COURT:  Certainly, let's just take -- let's

13   forget about everything he did before he was 18 and just

14   focus on the last three or four years.  That's what I have to

15   do.  I have no choice.  I can't predict the future.  None of

16   you can predict the future.  I have to try the best I can to

17   figure out if there are conditions that can be set.  And in

18   doing that, I have to figure out what the last two or three

19   years say about that.  Maybe they don't say anything.

20             MR. MAGUIRE:  And I do think, actually, though, that

21   say this were a different case and say Mr. Elshazly were

22   extremely wealthy, he has a million dollars or many millions

23   of dollars, maybe more money in foreign assets.  He owns a

24   plane.  I think that that would certainly weigh heavily in

25   the Court's consideration of does that other person pose a

1    risk of flight, because you would say this person actually

2    has a real means of leaving the country to accomplish what

3    they might want which would be to, you know, live happily in

4    a non-extradition country.  And so in that case it certainly

5    would feature.  Here my point is this, and the Government can

6    say whether this is untrue.  My understanding is that it

7    appears the Government provided a pretend path, and it's not

8    a path that really exists.  This is also not a case in which

9    the Government is saying Mr. Elshazly has some established

10   and existing network of people certainly here, not here in

11   Connecticut who --

12            THE COURT:  I get what you're saying and I'm not

13   going to get into that right now.  But the flight issue isn't

14   about whether he'll flee to a foreign country, right?  The

15   flight issue is simply whether he'll flee this jurisdiction,

16   not appear in court.  And it's a simpler question.  The

17   question being can the Court set conditions that will

18   reasonably assure his appearance in court.  Not can the Court

19   set conditions that reasonably assure he doesn't flee to a

20   foreign country.  Because they're two different questions.

21   The question I have to answer is whether I can set conditions

22   that will reasonably assure his appearance in court.  And to

23   do that, I have to look at not just the nature of the offense

24   conduct but, also, what I can know about him from the

25   background that's in the Pretrial Services Report.

1           MR. MAGUIRE:  And I think sort of imagining the

2    other alternative, Mr. Elshazly simply chooses not to

3    be -- not to appear in court.  I do think even here we get

4    into resources, questions.  I don't think there's any

5    indication he has the means to do that.  I think also very

6    important is to come back to the reality --

7           THE COURT:  Let's focus on that for a second.

8    You're proposing a bond, correct?  And so I think we all

9    agree that the defendant signing a non-surety bond himself

10   really has no meaning because he has no assets.  So now we

11   need to look at the people who are posting property.  And

12   what I ask myself is not whether those individuals have

13   something to lose, but whether he cares about that.

14          MR. MAGUIRE:  I agree.

15          THE COURT:  Whether he cares that if he flees that

16   his family will be in jeopardy because the Government can go

17   after them for money.  That's really a big question here,

18   isn't it?

19          MR. MAGUIRE:  That is the question.  That is, in

20   important ways, the function of that bond.  What I can say is

21   that Mr. Elshazly's family, again, his aunt, both of his

22   parents, have had conversations with him.  Are fully aware of

23   what the allegations here are.  And what they understand is

24   that he is not going to betray them in that way.  And I'll

25   also say --

1           THE COURT:  I mean, when I look at the Pretrial

2    Services Report, I see that his mother always thought he was

3    a good boy.  Not entirely sure how he got into this

4    situation.  I think it's fair to say that she hasn't been

5    posted or suggested as a third party custodian because she

6    didn't have control over him.  Now we look at his father.

7    His father, as you point out, lives in Frederick, Maryland.

8    He did live with his father, but for a short period of time.

9    And then he moved back to Connecticut.  So his ties to his

10   father are not the kind of ties that you would suggest that

11   it would be important to him that his father, as a co-signer,

12   not be out of money.  And now we look at his aunt, who is

13   taking on the biggest responsibility here, and I just don't

14   see that she had involvement in his life prior to this case.

15          My only point is when we talk about flight, what

16   we're really focusing in on is what guarantees can we look to

17   so the Court can be reasonably assured, understanding that

18   it's reasonable assurance, that he doesn't pose a risk of

19   flight.  And so your proposal of the bond package, my only

20   point is that I'm not sure it really does address that

21   concern.  And I recognize the bigger picture that flight is

22   rarely something that occurs in this district, but I don't

23   think -- you can agree this isn't your typical case.

24          MR. MAGUIRE:  Although the concern about flight that

25   the Court has raised is the typical case type of concern.  I

1    think the thing that I want to say first is that the

2    assumption that -- these are not distant relatives.  These

3    are not people that have been away or apart of Mr. Elshazly's

4    life.  This is his mother, this is father.  This is, yes, an

5    aunt who has been a step removed from his day-to-day life,

6    but is someone very close to him.  The nature of their

7    relationship is one that she is willing to take on enormous

8    responsibility.  He has continued to be in very close contact

9    with his father who has come up here to visit him at Wyatt

10   while living in Maryland.  I think the reality here is these

11   are his parents.  And I understand that --

12              THE COURT:  And yet you're not proposing them as

13   third party custodians.  That's my point.  Yes, they're his

14   parents.  But for reasons at least as far as the parent that

15   played the biggest role in his life, which is his mother,

16   you're not proposing him.  I'm not faulting you for that.

17   But my only point is that to me it somewhat undermines the

18   claim that he would be worried about her co-signing a bond on

19   his behalf.  Meaning, that it would be a deterrent to him.

20              MR. MAGUIRE:  I think these two things are really

21   fundamentally different.  That the question -- the function

22   that that bond is serving is do you -- are you going to avoid

23   taking action to hurt this person?  Do you care if this

24   person is hurt?  That is a different question, a very

25   different question from is this the best person --

1           THE COURT:  Financially hurt.

2           MR. MAGUIRE:  Absolutely, yes.  Someone who owns a

3     house.  Do you care about their basic lifestyle and mode of

4     living being radically altered.  Right.  I'm not talking

5     about torture.  But seriously substantially affected and

6     harmed.  A person who has been providing for him financially,

7     who he's lived with essentially his entire live.  We

8     certainly could have proposed her as the custodian.  I think

9     what would have happened is I would have come here and the

10    Court rightly would have said, well, wasn't this all

11    happening under her eyes.  The change is because of that.

12    But I don't think it does anything to reduce the reality of

13    who she is to him as co-signer.  It also doesn't change who,

14    again, his father is to him.  If, frankly, as I said, if it

15    mattered, if it were better that he be with his father, he is

16    available as an alternative custodian.  It's purely for

17    logistical reasons that he isn't the person being proposed

18    here.

19          So I think that that role is very well served by

20    these people who are very close to him.  And they do

21    understand this is a case in which the allegation is that

22    Mr. Elshazly was willing to leave the country, to leave home.

23    We'll note, of course, that he hadn't left home in any

24    meaningful way until he was provided with a pretty smooth

25    path by the FBI.  And that is different than saying he didn't

1    sort of leave home and saying I'm going to steal my family's

2    life savings and I'm going to use that savings, even though I

3    know it's really going to hurt them, to get myself to Syria.

4    That is not the situation we have here.  But that would be

5    the sort of situation that Mr. Elshazly would face on

6    release.  And I do think that's fundamentally different.

7              So, again, we are proposing, frankly, very

8    restrictive conditions.  Part of the reason that they are so

9    restrictive is that he hasn't demonstrated that he has a

10   whole lot going on outside of the home.  And so we're

11   suggesting he should be kept in his house under very tight

12   conditions.  But he's also, again, not someone who has really

13   done much of anything.  Not much positive, but really not

14   much negative.

15             And I want to say, too, I understand the allegation

16   is that he took -- ultimately took action.  Thought crime is

17   not a crime in this country.  Short of that, his beliefs or

18   interests or any of that are not something that is itself

19   illegal.  And I think mostly what he seems to have been doing

20   is, again, playing video games.  Is that a question of is he

21   going to be productive?  That raises real doubts about how

22   productive he's going to be.  But that's, again, not the

23   question here.  We're not asking for him to have opportunity

24   to be productive.  We are asking for him to have opportunity

25   to be home, to show that he can earn the Court's trust.  To

1   be, frankly, closer to -- I mean, one of our interests is

2   that it's far easier to review disks and disks, I understand

3   hours and hours of discovery, with someone who is not

4   detained.

5        This, again, I think is someone who, faced with

6   merely any other offense, would be an easy person to release.

7   And I'll mention, too, often the people who are in this

8   situation, Criminal History I, in their 20's, have great

9   family support, live at home, everything is stable.  Some of

10  the people who get detained are facing serious mandatory

11  minimums.  That is not the case here.  The charge here has no

12  mandatory minimum.  My quick look at the Sentencing

13  Guidelines for someone in Criminal History I is maybe a 46 to

14  57 month range, below any five-year mandatory minimum.  Yes,

15  potentially an amount of time.  But, again, not the sort of

16  enormous amount of time on the surface that you would say

17  this person who faces 10 years mandatory may have an

18  incentive to just try to leave and never have to come to

19  court and, you know, live underground.

20        Although the name of the case is serious, and I

21  think that there are concerns raised, again, emotional

22  political concerns raised by what might have happened many

23  steps down the line.  Frankly, probably wouldn't have.

24  Mr. Elshazly I don't think is useful to anyone as a soldier.

25  Those concerns I think loom over large, but the practical

1    realities here are that, again, if this case were named

2    something else, I think Mr. Elshazly would have gone home two

3    months ago.

4          So I'm happy to answer other questions, details

5    about the proposed co-signers.  As I said, his aunt is

6    willing to speak to the Court if that's something that would

7    be helpful.  I know she's had a chance to talk to Probation

8    who has done a home visit.

9          THE COURT:  All right.  Well, let me hear from the

10   Government.  I may have some questions, but let me hear from

11   the Government.

12         MR. MORABITO:  Thank you, Your Honor.

13         Judge, I'm going to respond to a couple of things

14   that Mr. Maguire said.  But from the Government's

15   perspective, Your Honor knows the presumption applies.  I

16   don't think the package proposed by Mr. Maguire rebuts that

17   presumption.  But even if it did, there are no conditions, in

18   the Government's view, that can reasonably assure the Court

19   regarding Mr. Elshazly's appearance and dangerousness to the

20   community.

21         I'll start with non-appearance, a risk of flight,

22   since we spent a lot of time or Your Honor spent a fair

23   amount of time with Mr. Maguire on that.  I would note,

24   Judge, Mr. Elshazly is not here for some -- because of some

25   emotional political response or anything like that.  He's not

1     here because he surfed the internet.  He's not here because

2     he expressed a view differently than others.  He's here

3     because he was prepared, ready, able and willing to travel to

4     fight and kill Americans in Syria.  It's not that simple.

5     That's why he's here.

6          He has no appreciable employment since the time he

7     dropped out of school.  Any employment he's had has been

8     sporadic.  His most recent job, my understanding is he was

9     fired from prior to being arrested in this case because he

10    didn't follow the rules there.  So I think that's an indicia

11    of -- another indicia of whether or not he'll follow the

12    rules of Probation.  He's somebody that was willing

13    to -- believing, as Your Honor noted, believing that he

14    couldn't fly, he was willing to smuggle himself on a boat to

15    take a long trip overseas to get where he wanted to get to.

16    And I don't think GPS and/or home confinement, home

17    incarceration, home detention, whatever we want to call it,

18    is sufficient to overcome the fact that he likely can't get

19    to Syria, Your Honor.  I'm not going to sit here and say as

20    we stand here now that he could get there.  I don't know

21    where he could go, but I think that the fact that he was

22    fully prepared to do that speaks volumes about his mindset.

23          I think that in -- I say this respectfully to

24    Mr. Maguire.  He obviously doesn't have the benefit of the

25    discovery, a lot of which I'm going to talk about now, he'll

1    have in his possession when he leaves here today.  But I

2    think it's important for the Court, and I'm going to proffer

3    it to Your Honor, if that's acceptable at this point.

4            Mr. Elshazly is somebody who holds himself out as an

5    extremely tech savvy person.  He is very computer savvy.  He

6    is somebody that knows how to avoid detection of law

7    enforcement through the use of encrypted aps, through the use

8    of fake phone numbers, through the use of different SIM cards

9    for particular phones.  He's an individual who, based on the

10   investigation, has spent a lot of time figuring out ways to

11   avoid being detected by law enforcement.  And he teaches

12   other people the same thing.

13           So the fact that there's a proposal that he'll have

14   no internet access and he'll be on a GPS bracelet, I don't

15   think in any way addresses the concern of non-appearance.

16           I think, Your Honor, that -- and I say this

17   respectfully to the family -- he was engaging in this very

18   serious conduct under the roof of his mother, and I think

19   with her knowledge.  I think she was aware of the things he

20   was doing and what he was associating himself with.  I don't

21   think she understood the extent of it or maybe the

22   seriousness of it, but I think she was well aware of it.

23           As to her father, who as Your Honor --

24           THE COURT:  Can you just tell me why you think that?

25           MR. MORABITO:  Well, he's -- through the course of

1    the investigation, Mr. Elshazly made various statements that

2    are recorded that Mr. Maguire will eventually get and be able

3    to hear that his mother would hear and see the things he was

4    doing.  And he would essentially tell her to mind her

5    business.  I mean, he would do more than that.  But

6    effectively she knew what was going on under the roof.

7    Again, I don't think she understood the extent of it, but I

8    think I can stand here and creditably tell Your Honor that

9    she had significant concerns about what he was doing and how

10   he was spending his time and she didn't do anything in that

11   respect to address those concerns or, Your Honor, she didn't

12   feel she could address those concerns with her son.

13        The investigation also revealed that for the short

14   period of time that Mr. Elshazly lived with his father, his

15   father became aware that -- his father became aware that he

16   had -- infatuation is not the right word, Your Honor, but he

17   had a desire to be involved with ISIS.  And this doesn't come

18   from any statements of his father.  This comes from the words

19   of Mr. Elshazly that are recorded where he says his dad was

20   concerned with that, and this is many years ago, his dad was

21   concerned.  Mr. Elshazly indicated that some local police

22   officer, I don't know if it was maybe an officer from the

23   school, I don't know the nature of that, came and talked to

24   him but he was never arrested.  But he made these statements

25   on a recording.

1              So I think to the extent his mother or father are

2    shocked that he's here for this particular conduct, I don't

3    think that -- or I think the Court should look at that at

4    least under that lens with that information.

5              As for Mr. Elshazly's aunt, I think Your Honor's

6    point, I was going to echo as well, is she was not involved

7    in his life in any appreciable way, at least to the extent

8    that they're proposing now.  And I think that should cause

9    the Court concern in that respect.

10              But I think, Your Honor, that one of the, you know,

11   sort of turning to danger.  And, again, I'm going to put a

12   number of things on the record and it's all within the

13   discovery that I'm going to provide to Mr. Maguire, but I

14   think it's important.  I think it's very instructive as to

15   the mindset of Mr. Elshazly, the way he thinks, the way he

16   was thinking, and what his intentions were.  And I think it's

17   a very good indicator of the risk that he poses to the

18   community if he's released.

19              Mr. Elshazly consistently, over the course of at

20   least a year, has indicated a very real desire to kill people

21   on behalf of ISIS.  He has indicated on many occasions a

22   clear intention to kill U.S. citizens here and abroad.  He

23   has indicated that he was prepared to build a computer server

24   on behalf of ISIS to help in their fight overseas because

25   oftentime the communication equipment is knocked out overseas

1   during fighting.

2          He has indicated that he believes anybody that

3   fights against or opposes ISIS should be killed.  He has

4   indicated that his goal was to become "an ISIS killer."

5   That's what he wanted to do.  He has indicated that he has

6   the capacity and the knowledge to build missiles and other

7   weapons.  He has indicated that -- on several occasions that

8   if he was ever confronted by law enforcement that he wouldn't

9   be taken alive.  He'd rather be killed than serve time in

10  prison.  Now, obviously, he was arrested here generally

11  without incident, but I note that those were statements that

12  he made

13         His phone, Judge, in reviewing one of the phones

14  that he was arrested with as part of the search warrant and

15  based on the investigation, his phones -- his one particular

16  phone that's been searched to date contains hundreds of

17  videos of ISIS propaganda.  And I don't say that because I

18  believe, you know, possessing a particular -- possessing a

19  particular document is a violation of law, but I think that

20  it, again, it's instructive of the mindset of Mr. Elshazly.

21  The videos are quite simply, Your Honor, extremely

22  disturbing.

23         Mr. Elshazly collects them and disseminates them to

24  other people.  And they include things like multiple

25  beheading videos, incredibly grotesque beheading videos.

1    There's a video of four ISIS prisoners being drowned and

2    videotaped.  There is upclose sniper rifle killings by ISIS

3    soldiers of prisoners.  There is a video of a gentleman tied

4    to a tree and his arms are cut off and then he's beheaded.

5    There is a video that indicates how you filet a human being,

6    and then the individual proceeds to filet and kill that human

7    being.  There is videos of U.S. troops and coalition forces

8    being killed by suicide bombers, IED's and gun fire.

9         There are videos of just generally other extremely

10   disturbing things, all of which Mr. Elshazly took great pride

11   in collecting and sorting and then disseminating to other

12   people, and then telling other people that this is what

13   happens if you stand against ISIS.

14        There's a -- as part of the investigation, Your

15   Honor, there's a recorded conversation where Mr. Elshazly

16   shows an individual a suicide bombing of a gentleman in a

17   wheelchair, I believe in a wheelchair, and then indicates in

18   the recording wouldn't it be great if we did that.  We would

19   go to heaven above everyone else.

20        There is evidence of Mr. Elshazly running an online

21   group that he controlled who was in it, who was permitted to

22   be in, where he put forth the propaganda of ISIS where he

23   himself administered the pledge of bayat, which is your oath

24   of allegiance to ISIS for other individuals.  So

25   Mr. Elshazly's not here because he was surfing the internet.

1          There is at least three incidents when Mr. Elshazly

2     was in the community that I think, again, should be

3     concerning to the Court.  They certainly are and were

4     concerning to the Government.

5          One where he was at work and he was sitting in a

6     truck in Target here in Connecticut.  Two service members

7     came walking by.  Mr. Elshazly yelled out Allahu Akbar to

8     them.  The recorded conversation indicates that it's not

9     clear whether the service members heard it, but that

10    Mr. Elshazly indicated to the individual he was with that

11    it's important to strike fear in these people so essentially

12    they know what you're willing to do.

13         There was an incident where there was a female in a

14    store when Mr. Elshazly was working where he believed that

15    she was inappropriately dressed, where he was pushing a piece

16    of equipment at her rather quickly and the individual with

17    him effectively had to -- essentially yelled at him and

18    stopped him from hitting the woman.

19         There was an incident where Mr. Elshazly was with

20    another person where this person allowed an Orthodox Jew to

21    walk in front of them.  Mr. Elshazly became irate at this

22    person and indicated that Muslims are at the top and why

23    would you ever allow someone below you to walk in front of

24    you.

25         And I think, Judge, again, all these things are an

1    indicia of the mindset of Mr. Elshazly.  And I think he

2    candidly, Your Honor, poses a significant danger to the

3    community if released.  Again, sticking him on a GPS bracelet

4    on home confinement, incarceration, detention, whatever that

5    might be, is certainly not sufficient to address those

6    concerns.  And, again, I understand Mr. Maguire is at

7    somewhat of a disadvantage because he hasn't seen all of this

8    stuff up to this point.

9         But there are other things, Judge, he said which I

10   can go on, unfortunately, for Mr. Elshazly, and on, that I

11   think show a clear intention on his behalf.  And I think the

12   fact to injure people who don't follow the beliefs of ISIS.

13   There was a particular statement, Your Honor, where

14   Mr. Elshazly indicates that he believes that any non-believer

15   should be what he said taxed.  He used a different word.  But

16   essentially they should be taxed.  And if that individual

17   refused to pay that tax, then they should be killed and the

18   women and children should be enslaved.  And he believes

19   that's how it should be in the United States.

20        This is not a person who has a great deal of respect

21   for the United States, for the laws in the United States, for

22   the people in the United States.  Quite frankly, Judge, for

23   anybody that thinks differently than him.  And Your Honor had

24   asked a question what has he been doing for the past couple

25   of years.  The Government's view is what he's been doing is

1    studying how to become an ISIS fighter.  And this was a

2    culmination of where he wanted to be.  And now that that's

3    gone, if the Court releases him, he's left with no

4    possibility likely to get to Syria, but he's left with other

5    options to put forward what ISIS believes in.

6            Judge, I think I can say this because I think it's

7    public record.  You know, the leaders of ISIS indicate that,

8    you know, there are certain things people should do.  And if

9    you can't travel to fight, which is something Mr. Elshazly

10   has promoted, and you can't collect money or you don't want

11   to collect money on behalf, you should strike where you are,

12   and that includes in the United States.  And whether it be

13   with a knife, whether it be with a car, whether it be with a

14   hammer, whatever it may be.  So I don't, respectfully to

15   Mr. Maguire, I don't think Mr. Elshazly is somebody that

16   should be at large in the community.  And really, the radical

17   shift for Mr. Elshazly should be that he remains in jail

18   pending a resolution of these charges by way of a plea or

19   after a trial.

20           So if Your Honor has any questions, I'm happy to

21   answer them at this point.

22           THE COURT:  So all the information you just

23   proffered came from videos that you viewed or that law

24   enforcement viewed on his phone, recorded conversations

25   involving I assume some sort of CI.  The three incidents that

1   you talked about, were those described to law enforcement by

2   people that have been with him?

3         MR. MORABITO:  I think I know the answer, Judge.  I

4   want to make sure so the record --

5         Judge, all three are audio recorded and also have

6   been described to law enforcement by the witness.

7         THE COURT:  Okay.

8         MR. MORABITO:  Judge, the only other thing I guess I

9   would add is in paragraph 27 of the complaint, Mr. Elshazly

10  indicated, he says, I want to go to the Caliphate and fight

11  there.  I can kill maybe like a hundred kaffir,

12  non-believers, kaffir.  A hundred kaffir.  If I do something

13  here, how many kaffirs could I kill, one, two, three, and

14  then I get shot and I die.  It is more benefiting if I go

15  there, I could kill more and will get more fruitful faithful

16  rewards.  Again, this is the mindset of Mr. Elshazly.  It's

17  not that he said I will never do anything here in the United

18  States when he's being recorded and he doesn't know it.  It's

19  that he believes he can do more good fighting in Syria on

20  behalf of ISIS.

21        THE COURT:  What paragraph was that?

22        MR. MORABITO:  27, Your Honor.

23        THE COURT:  Thank you.

24        MR. MORABITO:  Thank you.

25        THE COURT:  Mr. Maguire, before I ask you to respond

1    to the substance, what I want to understand better is the

2    Government had offered through the Probation Officer to play

3    some of these videos during the hearing.  I'm satisfied to

4    rely on the prosecutor's description of the videos, but I

5    understand you probably haven't seen them.  So I need to know

6    from you whether you would like the Court to have them played

7    during the hearing or whether it is essentially okay to rely

8    on Attorney Morabito's description of what they show.

9         MR. MAGUIRE:  So I think it makes sense to rely on

10   the description.  What I hear from this is these are a bunch

11   of videos that alleged to have not be of Mr. Elshazly doing

12   anything, but simply videos that exist.

13        THE COURT:  Correct.

14        MR. MAGUIRE:  And I think getting back to my first

15   point, these are clearly things that have significant

16   emotional content.  I don't think that there's a point in

17   playing them.

18        THE COURT:  That was my intention, but I didn't want

19   to -- I wanted to make sure that you agreed with that.

20        MR. MAGUIRE:  I'll begin by responding that I

21   actually think that the Government's offer to play these

22   video as part of its presentation is suggestive of what is I

23   think largely what I have heard is a play on emotions.

24        THE COURT:  I mean, I have to push back on that.

25   First of all, we deal with cases with difficult facts every

1    day in this court.  We deal with child sex trafficking.  We

2    deal with distribution of disturbing videos involving, you

3    know, child sex abuse.  And so we are used to having to deal

4    with charges that involve conduct that you would consider to

5    be whatever you just said, you know, evoke emotional

6    responses.  And I think the Court is quite capable of being

7    able to address or deal with that conduct without having an

8    emotional response, but it does come up in those cases as to

9    whether videos should be played, shouldn't be played.  And my

10   only point was I wasn't intending on having them played.  And

11   Attorney Morabito didn't just suggest it during his proffer.

12   I just didn't want to not mention it and then have you later

13   say the Court should have played the videos.  That's all.

14          MR. MAGUIRE:  I understand that.  And I think what

15   is different, though, I just want to state this briefly, is

16   often in a case of child sex videos, the point is that

17   there's a depiction of a crime.  That the crime is, in fact,

18   having this video.  Here the function of this is, as the

19   Government has said, it's not a crime to have this video.

20   This would be a video depicting other people doing other

21   things somewhere else.  And I do think that this type of case

22   is different in the sense that the resonance isn't just about

23   what did this person do, but about what did completely

24   unrelated people do elsewhere in other parts of the world.

25   That's the point there.

1           I think, though, that what is also significant here

2    is what we've heard from the Government is that, at this

3    point in their investigation, they seem to have a pretty

4    significant insight into Mr. Elshazly, through his computers,

5    through his phones, through confidential informants over the

6    past several years.  And, notably, what we haven't heard is

7    that Mr. Elshazly, other than this alleged final effort to

8    leave the country, did anything to materially harm anyone.

9    They claim that Mr. Elshazly claims that he has tech savvy.

10   What I heard from as the specific examples was he may know

11   how to use a SIM card and how to download an encrypted chat

12   ap.  I can do those things.  I think most people in this room

13   can do those things.  These aren't claims that he actually --

14           THE COURT:  I think you're overestimating my

15   abilities.  But, I mean, if you look at the complaint

16   affidavit, paragraph 18 talks about the online messaging

17   application that he downloaded on to the CHS's phone and

18   essentially this group chat.  Mr. Elshazly vouches for the

19   person.  And then there's a number of things that are

20   discussed during these sessions.  I think that the

21   Government's point was that -- I think they were really

22   focusing in on this internet access point.  That Mr. Elshazly

23   is far too sophisticated to think that cutting off his

24   internet access is somehow going to impede his ability to do

25   what he wants to do because he's tech savvy.  I think that

1    was their point.

2              MR. MAGUIRE:  And my responsive point is what they

3    tellingly point to is not evidence that Mr. Elshazly actually

4    has meaningful skills.  Again, this paragraph is just about

5    having a messenger ap, again, that not particularly

6    sophisticated.  They have not said we have evidence after

7    these years of exploring Mr. Elshazly and all of this content

8    that he has the capability of building a server, he has the

9    capability of, I don't really know, how do you access the

10   internet without any devices, or that he has some super human

11   or particularly special skills.  What they point to is things

12   he says.  He also says, and this is getting back to what the

13   Government said is, they'll never take me alive.  And yet, as

14   the Government knows, they very quickly, and as the

15   Government said, without real incident took him alive.  I

16   think the things that someone says, and this just isn't about

17   Mr. Elshazly, I think it's about online communities of

18   varying sorts, some of which are perfectly innocent, many of

19   which are disturbing, I think, to most outside observers,

20   tend to be dramatic.  They tend to be things you can very

21   easily say and sound like you mean them because you don't

22   need to do anything about it.  You can say they'll never take

23   me alive.  You can say I'm going to build missiles.

24             THE COURT:  But look at the paragraph -- again, not

25   to -- I'm purposing focusing on the affidavit because you do

1    have that.  So in paragraph 38, Mr. Elshazly -- it's November

2    27th.  He says that his online messaging ap was deleted and

3    he continues to say I'm getting phone calls from members that

4    I don't know from California.  Happened the same day my

5    account got deleted.  I think something might happen to me

6    soon, but I'm ready to die.  And then, of course, you know,

7    the case proceeds.

8         So I understand what you're saying, but some of

9    these words in that context do matter, right?  In other

10   words, if that point was a wakeup call for him to essentially

11   go maybe something's happening, maybe law enforcement might

12   be on to you, maybe it's a time that your words which didn't

13   mean anything, folks, didn't mean anything, wasn't being

14   serious, maybe that's the time to just back off which, of

15   course, doesn't happen.

16        MR. MAGUIRE:  So I think, obviously, the final

17   allegation of Mr. Elshazly appearing in front of the boat has

18   that significance.  I actually think this sort of cuts the

19   other way in terms of if Mr. Elshazly had reason to think

20   that maybe law enforcement were on to him and maybe this was

21   all set up, if he is someone with the capacities that the

22   Government suggests, he might have been armed in any number

23   of ways.  He might have taken precaution to be able to take

24   some action.  You don't see, though, Mr. Elshazly doing

25   anything dangerous.  And I think -- and the suggestion is,

1    oh, the end might be nigh, you would expect some sort of

2    active response to that that reveals the act of danger.

3         THE COURT:  But you look at paragraphs 40, 41, 42, I

4    mean, it goes through what he actually does.  I understand

5    your point, but here he says he's prepared to die.  He sleeps

6    with a knife.  Then on December 6th, he says that he has more

7    than enough money to buy a ticket.  He's asking people who

8    wants to go.  He says yes.  And then same day he sends the

9    other source a series of YouTube videos entitled How a AK 47

10   Works.  M 16 and AR 15, How Firearms Work.  How Colt Works.

11   How RPG 7 Works.  How a Grenade Works.  Guns and How They

12   Work by Ian Hogg.  This pdf has a lot of guns and how they

13   work.  We should make our own guns.  In other words, you

14   know, this is, what, a week and a half, maybe a week after

15   he's convinced himself that law enforcement might be on to

16   him.  And that's an inference, but I don't think it's a

17   speculative inference.  I think it's a fair inference from

18   his own statements.  He says he thinks they're on to him.

19   And then he proceeds to engage in actions which would suggest

20   that his response to law enforcement is to, you know, fire

21   his way out, is to go down shooting.

22         MR. MAGUIRE:  So, respectfully, I think that the

23   reality of what happens -- and, again, I do want to draw a

24   distinction between what is it to look at things on the

25   internet and what is it to do.  This is not a case where we

1    came anywhere close to someone going down shooting.  We live

2    in a country where especially someone who doesn't have a

3    criminal record but, frankly, even if you have a criminal

4    record, you can get guns very quickly and very easily.  We

5    have plenty of cases in this courthouse about exactly that.

6    There is a difference between something on the internet, the

7    notion of something, and the reality.  And I think that

8    although Mr. Elshazly's alleged to have gone to a boat, this

9    actually isn't a case where we get even adjacent to real

10   violence, to a real gun, to something that might have

11   happened that is a definitive harmful act.

12              THE COURT:  But, again, paragraph 48.  You know,

13   he's already sent a lot of videos that I didn't even ask you

14   about, right, that's in the affidavit.  And then he says to

15   the source, I know how to do what's in these videos.  And

16   that if we needed to make weapons, he could go to Turkey and

17   design them.  He could go straight to start fighting.  If you

18   don't need me to build weapons, send me straight and I can

19   fight.  I'm paraphrasing here.  And then it's him in

20   paragraph 48 where he says he has $1,100.  He researched

21   ticket prices.  He found a flight with two stops for $722.  I

22   mean, this is him talking, right.  He says the plane's a risk

23   because if he's stopped he would not be able to do anything

24   else.  And he's concerned that somebody may stop him.  I'm

25   leaving out some of the reasons why he's concerned, but those

1    aren't helpful to you.  And then, you know, it goes on

2    to -- he talks about all his concerns about an airplane.  And

3    then paragraph 53, he decides to take the boat.

4          I mean, I guess my point is past behavior can be

5    predictive of future.  And so what we do have here is we have

6    him, no one else, him, being worried about law enforcement.

7    He specifically says it.  That's on November 27th or 28th of

8    last year.  And then a week later he is the one who starts

9    talking about how to use guns, how to get guns, sending

10   videos about all the things that we've been talking about,

11   right?  And then he researches the plane ticket, what to do.

12   And then he talks himself out of it.  And then, again, at

13   that point is it over?  It's not.  Right.  He then decides to

14   go on this boat and we know what happens.

15         So what I'm trying to get at is putting aside the

16   fact that the videos are disturbing and putting aside the

17   fact that your claim that it's just his words, we have real

18   actions.  We have words, but we also have actions that I

19   can't ignore.

20         MR. MAGUIRE:  I think what we have is -- and this is

21   the sort of the dog that didn't bark.  There's the allegation

22   of an action, fundamentally, that is not -- and, again, this

23   partly gets to the danger, partly to the Government's claim

24   that Mr. Elshazly can't go to Syria, they said that, but he

25   can't be released.  Why?  He poses a danger.  And so, yes,

1    this is about a prediction of what may happen in the future

2    based on the past.  And the allegation is there's an action.

3    The extent of it is he reached actual actions, researching

4    plane tickets.  Not particularly either sophisticated or

5    dangerous.  Trying to get on a boat.  Not -- and, again, I

6    don't know from discovery how far back any of these

7    researches into guns go, but not where do I get a gun in New

8    Haven?  How do I do this?  Where am I going to go?  Look up

9    gun shop down the street.  That's not what they're saying.

10   This is all operating in this realm of they're not real, of

11   the internet.  The actual actions, the things that are

12   happening in the world don't support the notion that there's

13   research how do I shoot a gun and how do I get a gun.  There

14   isn't a gun.  And I think that is critical, because the

15   Government is asking the Court to believe there's going to be

16   a gun.  That's their danger concern.  That's their danger

17   argument.  And so when you say does the past predict the

18   future, I think the fact that with all of this here, there's

19   no gun.  There's nothing close to it.  With all of this

20   investigation, with all of this time, you can say there would

21   have been.  And so, again, I don't see that danger.

22          And I think that in this it is important that even

23   going, you know, on to a boat, it still has this element of

24   it's still a little bit make believe.  It's a -- I mean, it

25   shouldn't be.  I mean, it fits into a boyhood adventure

 1    narrative of leaving and going.  And it doesn't actually come
 2    very close to Mr. Elshazly being in the place and seeing that
 3    reality, as it would be if he held a gun and there's an
 4    allegation, you know, grabbed a gun and stopped from doing
 5    something.  We aren't anywhere close to that realm.  And
 6    that's why I'm concerned about the impact of these videos and
 7    these other things outweighing what they really say about
 8    what Mr. Elshazly has even allegedly done and what he would
 9    do.
10             THE COURT:  Okay.
11             MR. MORABITO:  Judge, may I respond just very
12    briefly?
13             THE COURT:  Sure.
14             MR. MORABITO:  Just to be clear, Judge, and I think
15    Your Honor made this point.  But the videos were, again, I
16    made that offer only because I wanted it to be clear that
17    Mr. Maguire hadn't seen those.  I know Your Honor covered
18    that.  But I do think -- I didn't talk about them to evoke
19    any emotional response from the Court, because I'm well aware
20    that the Court is not going to be emotionally moved by
21    anything as a representative of the Government that I say.
22    So that's the first thing.
23             I think, again, my point was it's instructive
24    regarding the mindset of what Mr. Elshazly believes and what
25    he thinks is how things should be in regards to ISIS.  The

1    fact -- I didn't get up here I don't think once and say that

2    there is a risk Mr. Elshazly would get a gun and shoot

3    somebody.  I said he's a danger.  I don't know what

4    Mr. Elshazly will do.  I don't know if he'll get a gun, a

5    knife, a baseball bat, a hammer, a car, his hands.  So I want

6    to be clear about that.

7         And I think his past behavior and actions have

8    proven that he's a danger to the community.  His whole goal

9    was to get to Syria and to kill on behalf of ISIS.  So,

10   again, I think based on that, Your Honor, and everything else

11   I said, and just based on the allegations, if we just look at

12   the allegations in the complaint, I think there's a

13   sufficient basis to continue detaining Mr. Elshazly.

14        Thank you.

15        MR. MAGUIRE:  Very briefly.  Mr. Elshazly has asked

16   me to add that I know there was -- the Government commented

17   on some claims about things that Mr. Elshazly did or said

18   regarding sort of individuals out in the world, not violent

19   things specifically.  I don't think this is critical.  We

20   disagree with at least the characterizations there.

21        THE COURT:  Okay.  Thank you.

22        Before I forget to ask, does either side object to

23   the Court relying on proffered evidence?  Meaning, I've

24   allowed both sides to essentially proffer instead of putting

25   witnesses on or offering exhibits.  But I want to make sure

1    there's no objection to doing that.

2            MR. MORABITO:  There's none from the Government,

3    Your Honor.

4            MR. MAGUIRE:  Nor from defense at this point.

5            THE COURT:  Okay.  All right.  We're going to take a

6    recess and I will come back with my decision.

7            (Recess.)

8            THE COURT:  You may be seated.  Thank you for your

9    patience.

10           I'm prepared to rule, but I'm happy to hear from

11   either side if they have anything additional.

12           MR. MAGUIRE:  I think very, very briefly.  I think

13   this was addressed.

14           THE COURT:  Sure.

15           MR. MAGUIRE:  The Government had made a claim that

16   someone accused Mr. Elshazly of being aggressive towards, I

17   believe, a female co-worker.  He just asked me to make very

18   clear for the record that's not true.

19           THE COURT:  Okay.  Thank you.

20           So I've written out my remarks just because I wanted

21   to make sure that I had them organized.  So please forgive me

22   if I don't look up the entire time.

23           I want to make it clear that the case is governed by

24   the Bail Reform Act.  I understand that there's a suggestion

25   that because of the underlying facts there may be a tendency

1    to be affected by emotion or politics or something else.  I

2    understand why Attorney Maguire said that, and I don't fault

3    you for saying that, but I want to make it clear that I don't

4    view it that way.  I view this as a case that involves

5    allegations by the Government that are in a complaint

6    affidavit.  I've done what I do in every case, which is to

7    consider the arguments that both sides have made, to consider

8    the allegations in the affidavit, to consider the bond

9    proposal, to consider any of the underlying facts about the

10   offense conduct and about the defendant's background and

11   characteristics, and to come to a decision that essentially

12   applies obviously the law.

13          So here the law under the Bail Reform Act is as

14   follows, as you all know from my original order of detention.

15           The case is governed by a rebuttable presumption

16   under 18, U.S. Code, Section 3142(e)(3), because there's

17   probable cause to believe that the defendant committed an

18   offense listed in 18, U.S.Code, Section 2332(b)(g)(5)(B).   In

19   this case, that's a violation of Title 18, U.S. Code, Section

20   2339(b).

21          And so what that essentially means -- I know you

22   know what it means, but just so I'm clear, Mr. Elshazly, what

23   that means is that simply based on the nature of the offense,

24   knowing nothing about you, knowing nothing about the offense,

25   knowing nothing about anything, that the law requires your

1    detention based on the nature of what you're charged with,

2    but it's a rebuttable presumption.  You can rebut that

3    presumption.  And I'm going to find that you have rebutted

4    that presumption because of your bond package.  Your bond

5    package includes three co-signers.  It includes the

6    appointment of a third party custodian, a condition of home

7    detention with GPS electronic monitoring, along with standard

8    travel restrictions and a restriction on internet use.  So

9    because of the strength of that bond package and the support

10   of your family, I will find that you've rebutted the

11   presumption created by the statute which, again, is based

12   simply on the nature of the charge with no additional

13   information about you or about the offense conduct.

14          However, I'm further concluding that the Government

15   has met it's burden of establishing both by a preponderance

16   of the evidence as to flight, and by clear and convincing

17   evidence as to dangerousness, that no condition or

18   combination of conditions will reasonably assure your future

19   appearance in court and the safety of others in the

20   community.  And I'm going to try to explain why.

21          As the Government explained in its proffer, the

22   defendant has consistently, through recorded conversations

23   and essentially written communications, indicated a clear

24   desire to kill others on behalf of ISIS, and has held himself

25   out as someone who is computer savvy, who can build computer

1   systems, who uses encrypted applications, who has used fake

2   phone numbers, multiple SIM cards, and has taught others how

3   to do that.

4        Mr. Elshazly himself led a chat group whose purpose

5   was to pledge allegiance to ISIS and discuss the killing of

6   those who disagree with the group's beliefs.  He's also

7   collected and distributed a number of extremely disturbing

8   videos depicting the beheading of hostages, the drowning of

9   hostages, the killing of hostages by sniper rifle, the

10  killing of soldiers by the use of roadside bombs, the

11  dismemberring of hostages, and has warned others that that's

12  what would happen if they went against ISIS.

13        To the extent that there's a suggestion, and there

14  was, that these were just words or just videos,

15  Mr. Elshazly's actions do corroborate the words in that there

16  were instances of him engaging with total strangers.  I want

17  to make it clear that this is not something the Court weighed

18  heavily in the Court's mind, but the fact that there were

19  discussion with three separate instances where essentially he

20  was upset about something because it went against or was an

21  affront to his beliefs, was an indication that it was more

22  than words.  But most importantly, and what did sway the

23  Court, was the details that are listed in the affidavit in

24  which he makes specific plans in this case to take a boat to

25  Turkey to join ISIS in the fight in Syria.  He states this

1    intention to multiple people throughout the affidavit.  I

2    should make it clear that the affidavit details offense

3    conduct that goes back to September 2018 and continues until

4    the date of arrest of December 2019.  Why is that important?

5    It's important because it shows this was not a very short

6    period of time.  If the Court were to try to infer that

7    Mr. Elshazly's words didn't mean what they said, one factor

8    would be how long had he been saying these things, had they

9    been the product of perhaps a short-term issue, a short-term

10   problem that developed, or were they a longer term plan.

11          As to flight, Mr. Elshazly was caught literally in

12   the process of leaving the United States.  In response to the

13   suggestion that this was a setup and he really had no real

14   intention, again, the paragraphs in the affidavit that I

15   discussed earlier rebut that discussion.  In late November

16   2019, as I mentioned earlier, Mr. Elshazly indicated that he

17   believed that someone was on to him.  He's not clear as to

18   whether or not he thinks it's law enforcement, but he is

19   clear that he thinks someone's watching him.  He says that

20   the ap that he had been using, the messaging ap had been

21   deleted, and he had been getting a number of calls from

22   California that he felt were suspicious.  So what does he do

23   in response?  That only heightened his rhetoric.  As the

24   affidavit spells out, he talks about sleeping with a knife

25   under his pillow.  He sends videos regarding the possession

1    and use of high powered rifles and rockets, and he researches

2    international flights.  Significantly, he researched the

3    flights and came up with essentially a flight that he thought

4    would be one he could take and then convinced himself that it

5    was too dangerous for him to fly and that he might get

6    caught.  And, again, what was his reaction to that thought?

7    His reaction was that he needed to get there another way,

8    because he couldn't do enough damage unless he joined the

9    fight abroad.  And so that's why he decided to take a boat.

10            In terms of his background and characteristics,

11   Mr. Elshazly dropped out of high school in the 9th or 10th

12   grade and has not held steady employment since.  His mother

13   has indicated that he'd never held a job for more than two or

14   three months, and the Government proffered that he had been

15   fired from his last job.  For the past several years it

16   doesn't appear that he's gone to work or gone to school.  And

17   what I would call a significant factor here is that there's

18   evidence that both of his parents knew of his actions and

19   could do little to stop it.  There's evidence that his father

20   specifically tried.  Had a police officer visit the home in

21   Maryland.  Instead, the defendant returned to Connecticut

22   where his conduct went unchecked by his mother who apparently

23   was upset about it.  I don't believe his aunt would be an

24   appropriate third party custodian because she had very little

25   involvement in his life.  And when I mean involvement, I mean

1    day-to-day supervision before the offense conduct -- before,

2    I should say, before his arrest. And there's really no

3    evidence to suggest that he would abide by her strict rules.

4    His parents both tried to intervene and that is significant.

5    His father tried to intervene by having a police officer come

6    to the house. That is significant. These things didn't have

7    an impact on him and his conduct continued. And so the idea

8    that, as well meaning as his aunt would be, and as committed

9    to the job as I know she would be, but the idea that she

10   would have an influence on him is not something the Court is

11   prepared to accept.

12         In this case what we have to do is, for better or

13   worse, look at Mr. Elshazly's past behavior to determine

14   whether it's a predictor of the future. So, for example, if

15   he had had a steady job, if he had a family members who

16   either were completely ignorant of what he was doing or could

17   show that they had the ability to engage him and to convince

18   him to abide by the Court's rules, we might be in a different

19   place. But what we do have, as far as past behavior, does

20   not give the Court the assurance that Mr. Elshazly would

21   abide by any conditions of release.

22         As I mentioned before, the offense conduct is

23   described in the complaint started in September of 2018 and

24   continued through the date of his arrest, which I believe was

25   in December of 2019. It was he who talked about -- it was

1    Mr. Elshazly who talked about traveling to Syria to join the

2    fight.  It was Mr. Elshazly who downloaded the messaging

3    application to the CHS's phone.  It was Mr. Elshazly who

4    collected and distributed the disturbing videos I mentioned.

5    It was him who led the group chat and researched

6    how -- essentially who pulled up videos about guns and

7    building rockets and bombs and then boasted about being able

8    to build them.

9          So in the Court's view, the Government's proffer

10   combined with the detailed allegations in the affidavit, do

11   establish by a preponderance of the evidence that

12   Mr. Elshazly would present a flight risk.  And in addition,

13   that his release would, there's clear and convincing

14   evidence, that he would be a danger to the community.

15         I will point out that in both instances the Court's

16   concerns are not necessarily related to flight to Syria or

17   use of high powered weapons.  Meaning that the Court has to

18   look at the totality of the circumstances and determine

19   whether there's a preponderance of the evidence that

20   Mr. Elshazly is a risk of flight from this jurisdiction

21   period.  Not whether he's a risk of flight to a particular

22   country.  And for the reasons that I've already indicated, I

23   think the Government has carried its burden.

24         And in the same vein, in terms of the dangerousness

25   part of the equation, again, the Court need not determine

1     whether there's clear and convincing evidence that

2     Mr. Elshazly would flee to Syria to commit the crimes that he

3     talks about over the recordings, but simply that his release

4     would pose a danger to others in our community.  And that is

5     what I tried to explain earlier.

6          I should also point out, as I mentioned before, that

7     even if the Government carries its burden, the Court may

8     still release Mr. Elshazly if conditions can be set which

9     reasonably assure the Court both of his appearance in the

10    future and the safety of others.

11         And I don't fault defense counsel for the bond

12    package that you have presented.  I do agree or believe that

13    it is the strongest bond package that you could present.  The

14    problem, as I tried to articulate before, is that the package

15    itself doesn't really address the concerns.  As I explained

16    before, I don't believe either electronic monitoring or a

17    third party custodian, in this case his aunt, would be an

18    effective deterrent.  These measures do not guarantee

19    anything.  What guarantees something is Mr. Elshazly's

20    behavior.  The conditions, such as GPS monitoring and a third

21    party custodian, are there to add assurance that his behavior

22    will abide -- that he will abide by the conditions.  And as I

23    tried to explain, I don't think either of these things would

24    do that.  And the reason, as I've tried to explain before, is

25    as far as a third party custodian, I don't have any comfort

1    that she would have any control or sway over Mr. Elshazly

2    based on her -- the fact that she wasn't involved in his life

3    prior to his arrest, and the fact that the two people that

4    were most important to him, his parents, did try to get

5    involved, did try to intervene, and were unsuccessful.

6         And then, of course, as we talked about with the

7    employment, employment wise, employment important in this

8    case, it's employment that can sometimes bring assurances to

9    the Court.  Here, it doesn't.  So what I mean to explain is

10   that I'm not holding against Mr. Elshazly that he's not

11   employed or hasn't been steadily employed, but it doesn't

12   weigh in his favor the way somebody who was here who had a

13   record of strong employment where it could weigh in that

14   person's favor.

15        So for all those reasons, I'm going to deny the

16   request for release.  I will issue a written decision on the

17   docket today.

18        Is there anything else that we need to accomplish in

19   Mr. Elshazly's case today?

20        MR. MORABITO:  Not from the Government, Your Honor.

21        MR. MAGUIRE:  I will note the parties have been in

22   discussion regarding a possible resolution of this case.

23   This is a preindictment matter.  We do have a waiver of 60

24   days.  In light of the fact that we just received discovery

25   and expect that those discussions preindictment would be

1    ongoing, I can make an oral motion now for it to continue the

2    probable cause and indictment deadlines or I can do that in

3    writing, whatever the Court's preference is.

4              THE COURT:  Just give me one moment.

5              Is there any objection to the motion to continue the

6    hearing?

7              MR. MORABITO:  No, Your Honor.

8              THE COURT:  Just give me one moment.

9              MR. MAGUIRE:  Sure.  And the waiver I have is

10   through April 30th of 2020.

11             So, Attorney Maguire, what I will do is I will

12   accept your oral motion to continue the probable cause

13   hearing from the current date of February 28th to the new

14   date of April 30th.  Let me just check and see if that's a --

15             MR. MAGUIRE:  I believe it's a Thursday.  I hope.

16             THE COURT:  Thank you.  But I will ask that you file

17   the waiver on the docket, if you have that.

18             MR. MAGUIRE:  Yes.

19             THE COURT:  So as long as the waiver's filed on the

20   docket, I will at the conclusion of the hearing enter an

21   order which postpones the probable cause hearing from

22   February 28th to April 30th for the reasons that defense

23   counsel gave on the record.

24             MR. MAGUIRE:  Just to be clear, I would ask to

25   continue the indictment deadline as well to that same date.

1           THE COURT:  Absolutely.

2           All right.  If there's nothing further, we can stand

3     in recess.

4           Thank you.

5           (Recessed at 1:29, p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3          I, Martha C. Marshall, RMR, CRR, hereby certify that

4    the foregoing pages are a complete and accurate transcription

5    to the best of my ability of the electronic recording held in

6    the matter of UNITED STATES V. AHMAD ELSHAZLY, which was held

7    before the Honorable Robert M. Spector, U.S.M.J, at 141

8    Church Street, New Haven, Connecticut, on February 13, 2020.

9

10

11

12                            /s/Martha C. Marshall
                              Martha C. Marshall, RMR,CRR
13                            Transcriber

14

15

16

17

18

19

20

21

22

23

24

25