UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIM. NO.  3:19-MJ-1708 (RMS) |
| AHMAD ELSHAZLY | : | April 23, 2020 |

**MOTION FOR RELEASE ON BOND AND BOND HEARING**

    Mr. Ahmad Elshazly is presently detained pending trial in connection with a complaint charging him with a violation of 18 U.S.C. § 2339B, attempting to provide material support to a foreign terrorist organization. At the initial presentment in this matter, the Court (Spector, MJ) detained Mr. Elshazly based upon the rebuttable presumption of detention arising from the offense. Doc. 2. Following a detention hearing on February 13, 2020, the Court (Spector, MJ) ordered Mr. Elshazly to remain detained. Doc. 18.

    In the two months since the detention hearing in this matter, the landscape of the world both inside and outside custody has seismically convulsed as a result of the Covid-19 pandemic. More, evidence disclosed by the government and information from Mr. Elshazly's father cast new light on important factual assumptions underlying the detention order. For the reasons that follow Mr. Elshazly therefore moves, pursuant to 18 U.S.C. § 3142(f), that the Court reopen the detention hearing on the basis of this new information and that the Court release Mr. Elshazly pending trial in this matter, subject to home incarceration in his father's custody and with a prohibition on access to electronic devices.

1

## THE COVID-19 PANDEMIC FUNDAMENTALLY ALTERS THE FLIGHT AND SAFETY CONSIDERATIONS IN THIS CASE

It need hardly be said that the Covid-19 pandemic has fundamentally altered the landscape of the world—both inside and outside of custody. In this case, those changes warrant reevaluation of the 18 U.S.C. § 3142 analysis with respect to both safety and flight.

First, with respect to safety, the Bail Reform Act is premised on an assumption that detention is a tool that can be used to promote the safety of the community. The rapid progression of the emerging COVID-19 Pandemic turns that assumption on its head. Emergency orders modifying the fundamentals of everyday living in America have been issued across the country because "social distancing" is critical to slowing the spread of COVID-19.[1] These same concerns have effectively shuttered courthouses, including in this district. "But behind bars, some of the most basic disease prevention measures are against the rules or simply impossible. Separating sick people from well people to prevent the disease from spreading can be nearly impossible in prison . . . People in prisons and jails live every minute of the day in close proximity to each other."[2]

Because of these inherent features, one judge has aptly described prisons as "tinderboxes for infectious disease[.]" *United States v. Jeremy Rodriguez*, Docket No. 2:03-cr-271 (Brody, J.) 2020 WL 1627331, at *1 (E.D.Pa., April 1, 2020). As of Tuesday April 21, the tinderbox at Wyatt has been definitively lit aflame, with a confirmed Covid-19-positive inmate. There is little reasons to think that Wyatt will be any more successful in preventing the virus from spreading in the facility

---

[1] The Justice Collaborative, *Explainer: Prisons and Jails are Particularly Vulnerable to COVID-19 Outbreaks*, available at: https://thejusticecollaborative.com/wp-content/uploads/2020/03/TJCVulnerabilityofPrisonsandJailstoCOVID19Explainer.pdf.
[2] *Id*.

2

than it was in keeping the virus out in the first place. While Mr. Elshazly is at Wyatt he is endangered by every one of the scores of guards and detainees surrounding him, any number of whom may be carriers of the disease, even unwittingly. And Mr. Elshazly himself poses the same risk to others in the close quarters where he is confined.

By contrast, on home confinement with his father,[3] Mr. Elshazly would interact with at most a handful of people and would be able physically to social distance even from these individuals as there is ample living space in his father's five-bedroom home.

More, the risks—both of flight and of danger—that Mr. Elshazly could pose in the community are substantially reduced by the societal changes arising from Covid-19. Most obviously, travel to Syria—impracticable even at the time of the original bond hearing—is now even further out of the question. A recent UN report indicates that in Syria "[b]order crossings remain impacted as Syria and neighboring countries continue implementation of precautionary measures. Most land borders into Syria are now closed, with some limited exemptions remaining (from Jordan, Turkey and Lebanon) for commercial and relief shipments, and movement of humanitarian and international organization personnel. International and domestic commercial flights remain suspended[.]"[4]

---

[3] Because Mr. Elshazly's father lives in Maryland, at the previous hearing Defendant proposed that Mr. Elshazly should live with his aunt in Connecticut. In light of the Court's view that his aunt would not be an appropriate third-party custodian, Defendant instead proposes that Mr. Elshazly reside with his father.

[4] "SYRIAN ARAB REPUBLIC: COVID-19 Humanitarian Update No. 06 As of 17 April 2020" https://reliefweb.int/sites/reliefweb.int/files/resources/Syria_COVID-19_Humanitarian%20Update%20No%206_17Apr2020%20FINAL.pdf

Defendant submits that any suggestion of danger Mr. Elshazly may pose domestically is entirely speculative, including for the reasons discussed further below. But even such imagined dangers are mitigated by present circumstances: social interactions of the sort the government expressed concern regarding are severely curtailed by Covid-19 restrictions, as particularly are group gatherings of any kind. A home incarceration order would further restrict Mr. Elshazly's exposure to others, as would a condition prohibiting him from accessing electronic devices.

Additionally, the Court's release order can be limited to the duration of the Covid-19 pandemic and may of course be conditioned on Mr. Elshazly's demonstrated compliance with the strict release conditions proposed. A recent release order issued by Judge Bolden with respect to a pretrial defendant with a serious lung condition facing charges that he participated in a large-scale drug conspiracy, for example, specifies:

> Because the circumstances of Mr. Thomas's release relate to his special health condition only, a condition which may be exacerbated by the coronavirus ("COVID-19"), this order remains in effect only so long as COVID-19 continues to present a significant public health concern to his incarceration. *See* 18 U.S.C. 3142(i) ("The judicial officer may... permit the temporary release of the person... to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."); *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993) (finding an incarcerated defendant, terminally ill with AIDS, could be released because the only appropriate medical care he could receive was at hospital).

US v Best et al., 3:20-cr-00028 (VAB), Doc. 44.

### NEW INFORMATION UNDERMINES CLAIMS REGARDING MR. ELSHAZLY'S FATHER'S PURPORTED INTERVENTIONS AND MR. ELSHAZLY'S PAST ACTIONS

In its detention order the Court expressed concern that "both of [Mr. Elshazly's] parents knew of his actions in professing support for, and a commitment to, violence committed on Americans in Syria and abroad, but could do little to stop him. Indeed, his father tried when the defendant was living with him for a short period of time in Maryland and even had a police officer visit his home in Maryland, but instead the defendant left his father's home and returned to Connecticut, where he continued, unchecked by his mother, to engage in the conduct of described above." Doc. 18.

Mr. Elshazly's father has indicated that these factual statements are in important respects incorrect. Specifically, he had no awareness of Mr. Elshazly's alleged support of ISIS. More, the incident in which police visited Mr. Elshazly's father's house had nothing to do with religion or ideology. Rather, when Mr. Elshazly was approximately 18 years old and living with his father, he stopped attending high school. His father requested that the local sheriff's deputy responsible for monitoring the high school visit the home to get Mr. Elshazly to return to school. However, because Mr. Elshazly was already 18, the deputy was not able to be helpful. Later, when Mr. Elshazly was approximately twenty, he returned to live with his father and nearly completed an adult education program before his mother brought him back to Connecticut.

In short, Mr. Elshazly's father did not stand helplessly by while Mr. Elshazly allegedly committed the acts described in the complaint affidavit. He remains willing and able to serve as a custodian to Mr. Elshazly. He is prepared if necessary to travel to Connecticut to retrieve Mr. Elshazly and to enforce the conditions of release, including regarding home incarceration and a prohibition on access to electronic devices.

In its order of detention, the Court also relies in part on evidence that "[t]o the extent that there is a suggestion that the defendant's own words were not meaningful and not indicative of violent behavior, his actions corroborate the words, in that there were three instances of him engaging with total strangers simply because he felt that something about their appearance or attitude was an afront to his beliefs." Doc. 18.

These "three instances" specifically relate to alleged events that government counsel proffered at the detention hearing: "One where he was at work and he was sitting in a truck in Target here in Connecticut. Two service members came walking by. Mr. Elshazly yelled out Allahu Akbar to them"; the second "was an incident where there was a female in a store when Mr. Elshazly was working where he believed that she was inappropriately dressed, where he was pushing a piece of equipment at her rather quickly and the individual with him effectively had to -- essentially yelled at him and stopped him from hitting the woman"; and the third "was an incident where Mr. Elshazly was with another person where this person allowed an Orthodox Jew to walk in front of them. Mr. Elshazly became irate at this person and indicated that Muslims are at the top and why would you ever allow someone below you to walk in front of you." Tr. at 40.

The reports underlying these reported events do not bear out any remotely violent action by Mr. Elshazly. The first and third incidents, importantly, involved nothing more than words, unpaired with any action. The second incident was presented in court as attempted action that would seemingly have involved aggressive action except the informant "stopped him from hitting the woman." The report regarding this incident (which can be submitted separately under seal) shows instead that the informant was unable to say definitively that Mr. Elshazly even noticed the woman. More, the report never claimed that Mr. Elshazly seemed to be at risk of hitting the woman—

6

instead, the informant worried that Mr. Elshazly might hit her *shopping cart*. There is, ultimately, no factually grounded allegation at all that Mr. Elshazly engaged in any kind of violent behavior based upon his alleged beliefs.

## CONCLUSION

For the reasons above, Defendant requests that the Court, reopen the detention hearing and order that Mr. Elshazly be released pending the trial of this case subject to conditions including that he be subject to home incarceration in the home of his father in Maryland and that he not have access to any electronic devices.

> Respectfully submitted,
>
> THE DEFENDANT,
> Ahmad Elshazly
>
> OFFICE OF THE FEDERAL DEFENDER

Dated: April 23, 2020    /s/ James P. Maguire
James P. Maguire
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: ct29355
Email: James_Maguire@fd.org

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 23, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ James P. Maguire
James P. Maguire

7