UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :   No. 3:19-MJ-1708(RMS)
                                 :
          v.                     :
                                 :
AHMAD ELSHAZLY,                  :
                                 :   New Haven, Connecticut
                Defendant        :   April 30, 2020
                                 :
- - - - - - - - - - - - - - - - x


VIDEO PROBABLE CAUSE/MOTION HEARING


     BEFORE:

         THE HONORABLE ROBERT M. SPECTOR, U.S.M.J.


A P P E A R A N C E S:


     FOR THE GOVERNMENT:

         OFFICE OF THE UNITED STATES ATTORNEY
             157 Church Street, 25th Floor
             New Haven, Connecticut 06510
         BY:  DOUGLAS P. MORABITO, AUSA


     FOR THE DEFENDANT:

         OFFICE OF THE FEDERAL DEFENDER
             265 Church Street, Suite 702
             New Haven, Connecticut 06510-7005
         BY:  JAMES P. MAGUIRE, AFD


                              Diana Huntington, RDR, CRR
                              Official Court Reporter

1                          TABLE OF CONTENTS

2

3     GOVERNMENT'S
      WITNESS              DIRECT    CROSS    REDIRECT    RECROSS
4
      CHRISTOPHER EVANS
5        By Mr. Morabito      14
         By Mr. Maguire                21
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **9:52 A.M.**

2              THE COURT:  We're here in the case of United

3      States of America v. Ahmad Elshazly.  The case number is

4      3:19-MJ-1708.

5              May I please have appearances of counsel.

6              MR. MORABITO:  Good morning, Your Honor.  Doug

7      Morabito on behalf of the government.

8              Also, Your Honor, by way of Zoom from out of

9      state is Justin Sher, he's a DOJ lawyer with the National

10     Security Division.

11             Also seated with me is Special Agent Chris Evans

12     from HSI.

13             THE COURT:  Good morning.

14             MR. MAGUIRE:  Good morning.  James Maguire on

15     behalf of Ahmad Elshazly.

16             THE COURT:  Good morning, Attorney Maguire.

17             I'll note that Mr. Elshazly is also present by

18     Zoom.  I can see him.

19             Mr. Elshazly, are you able to hear everything

20     that's going on?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  All right.

23             What I want to start with is just to talk

24     briefly about this Zoom hearing.  We're proceeding today

25     by means of teleconference or really video conference in

1  which the parties are appearing by video.  It's been

2  posted on the calendar and the website of the

3  District Court, so obviously it's open to the public.  The

4  public has joined.  And this is, in every sense of the

5  word, a court proceeding as we would proceed in court if

6  we were in a courtroom.

7          What I want to talk about is to verify, first of

8  all, that everyone can hear and see okay.

9          It sounds to me like Mr. Elshazly can hear and

10  see okay; is that correct?

11          THE DEFENDANT:  Yes, it is.

12          THE COURT:  All right.

13          Attorney Maguire, are you able to hear and see

14  everything okay?

15          MR. MAGUIRE:  I am.

16          THE COURT:  All right.

17          And Attorney Morabito, are you able to hear and

18  see everything okay?

19          MR. MORABITO:  Yes, Your Honor.

20          THE COURT:  Okay.  And I've already checked with

21  the court reporter.  We have my courtroom deputy and the

22  court reporter also by video and audio.

23          And as I mentioned before, this is not a sealed

24  case and this proceeding has been made open to the public.

25  And I'll note for the record that several members of the

1  public have joined.

2          I'll remind everything that the rules that apply

3  in federal court continue to apply to this proceeding,

4  meaning that there can be no audio or video recording of

5  any portion of the proceeding.  Those rules were posted as

6  part of the calendar and obviously apply today just as

7  they would if we were in a courtroom.

8          I would like to make sure to tell everyone that

9  if at any point you are unable to see or hear what's going

10 on -- and I'm really referring, most importantly, to

11 Mr. Elshazly, defense counsel, and government's counsel --

12 that you will immediately let us know so that we can fix

13 the problem.  As with any technology, we're going to run

14 into those issues, but it would be helpful if we knew so

15 we could fix them as soon as possible.

16          Mr. Elshazly, in light of the ongoing COVID-19

17 public health emergency, there was a federal law that

18 passed, the CARES Act, that allows us to proceed by means

19 of video conference.  And we can proceed in this matter

20 only if you consult with counsel first and then if you

21 choose to consent to proceed by means of video or audio

22 teleconference and to waive your right to be physically

23 present in a courtroom.  You have a legal right under

24 Federal Rule of Criminal Procedure 43 to be physically

25 present in a public courtroom with the judge, your

1  counsel, and the prosecution for today's hearing.  The

2  Constitution may also afford you to a right to be

3  physically present.  Therefore, we can proceed today by

4  video conference only if you decide to consent to this

5  video teleconference and to waive your right to be

6  physically present for this hearing.  Do you understand

7  everything I've said so far?

8             THE DEFENDANT:  Yes, I do.

9             THE COURT:  And do you have any questions about

10  anything that I've said so far?

11             THE DEFENDANT:  No.

12             THE COURT:  Thank you.

13        Have you consulted with Attorney Maguire about

14  your right to be physically present in the courtroom and

15  your wish to proceed today by means of video conference?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Do you feel you need any more time

18  to consult with him about this?

19             THE DEFENDANT:  I think we've spoken enough

20  unless he needs to speak more with me.

21             THE COURT:  All right.  I'll ask him a question

22  in a moment.

23        Are you knowingly and voluntarily consenting to

24  proceed by video conference today and to waive your right

25  to be physically present for this hearing?

1          THE DEFENDANT:  Yes, I do.

2          THE COURT:  Thank you.

3          Attorney Maguire, are you satisfied that your

4    client understands his right to be physically present and

5    that he is knowingly and voluntarily consenting to proceed

6    today by means of video conference and waiving his right

7    to be physically present?

8          MR. MAGUIRE:  I am.

9          THE COURT:  Okay.  And you've had enough time to

10   consult with him?

11         MR. MAGUIRE:  I have.

12         THE COURT:  Attorney Morabito, are you satisfied

13   that all the legal requirements have been met for this

14   hearing to proceed by means of video conference?

15         MR. MORABITO:  I am, Your Honor.

16         THE COURT:  Thank you.

17         All right.  I will make a finding that the

18   defendant has knowingly and voluntarily consented to

19   proceeding with this hearing by video teleconference and

20   waived his right to be physically present.

21         Now I'd like to turn to the reasons that bring

22   us here today.  I want to kind of go through my plan for

23   what we're going to do.

24         The first thing we'll do is the probable cause

25   hearing.  And at the start of the hearing, I'm going to

1    want Attorney Morabito to remind us what the charge in the

2    complaint is and what the elements of that charge are.

3    I'm also going to want to know who the witnesses are for

4    both sides and what exhibits we anticipate being

5    presented.

6         After the probable cause hearing, we'll turn to

7    the motion that Attorney Morabito has filed.  I'm

8    referring to the speedy trial motion.  I'll want to know

9    if Attorney Maguire objects.  And I'm going to want -- if

10   Attorney Maguire objects, I'm going to want a written

11   objection; we can talk about when that should be filed.

12   And also from Attorney Morabito I'm going to need a

13   proposed order setting out the language you think the

14   Court should use if the Court were to grant the motion.

15        And finally, we'll take up Mr. Elshazly's

16   request for release.  We'll take that up at the end of the

17   hearing today.  All right?

18        So why don't we start with Attorney Morabito.

19   Can you remind us what is the offense that has been

20   charged in the complaint and what are the elements?

21        MR. MORABITO:  Certainly, Your Honor.

22        The offense charged in the complaint is a

23   violation of 18 U.S.C. Section 2339B, that's attempting to

24   provide material support and resources to a foreign

25   terrorist organization.

1           The elements of that offense are:

2           (1) that Mr. Elshazly knowingly attempted to

3    provide material support or resources to a foreign

4    terrorist organization, here is himself, Your Honor;

5           (2) that Mr. Elshazly knew the organization was

6    a designated terrorist organization or that the

7    organization had engaged or was engaging in terrorist

8    activity or terrorism; and

9           (3) one of the jurisdictional requirements would

10   have to be met.

11          Here the allegations are that Mr. Elshazly is a

12   national of the United States; and the attempts occurred,

13   in whole or in part, within the United States; and that

14   the offense occurred in or affecting interstate or foreign

15   commerce.

16          Thank you, Your Honor.

17          THE COURT:  Okay.

18          Attorney Maguire, do you have any disagreement

19   as to the elements that were just articulated?

20          MR. MAGUIRE:  I have at least something that I

21   think is important to note.  From my understanding,

22   there's a sort of a gray area as to whether these are

23   elements or definitional provisions.

24          There are two important limiting provisions in

25   18 U.S.C. 2339B that were not articulated.  Specifically

1    (h) concerns limits on the definition of "personnel."  I'm

2    happy to read that into the record.

3               THE COURT:  Sure.

4               MR. MAGUIRE:  Certainly.

5               "(h) Provision of Personnel.  No person may be

6    prosecuted under this section in connection with the term

7    'personnel' unless that person has knowingly provided,

8    attempted to provide, or conspired to provide a foreign

9    terrorist organization with 1 or more individuals (who may

10   be or include himself) to work under that terrorist

11   organization's direction or control or to organize,

12   manage, supervise, or otherwise direct the operation of

13   that organization.  Individuals who act entirely

14   independently of the foreign terrorist organization to

15   advance its goals or objectives shall not be considered to

16   be working under the foreign terrorist organization's

17   direction and control."

18               There is another limiting provision or, rather,

19   a Rule of Construction that is (i) of the statute stating

20   "Nothing in this section shall be construed or applied so

21   as to abridge the exercise of rights guaranteed under the

22   First Amendment to the Constitution of the United States."

23               And again I think the Court's stance on this is

24   that these are elements that need to be articulated in an

25   indictment, for example, for the indictment to properly

1    allege the offense.  They're also not affirmative

2    defenses; they're a part of this provision.

3            THE COURT:  Okay.  Can you -- I think I

4    understood everything up to that last point.  And so are

5    you suggesting that if a grand jury were to indict

6    somebody of this offense, that a properly instructed

7    grand jury would have implicitly found that subsections

8    (h) and (i) do not apply?

9            MR. MAGUIRE:  I would say that a properly

10   instructed grand jury would have to be informed of the

11   legal definition of "personnel" and its limitations.  And

12   so, yes, would have had to have determined that

13   subsections (h) and (i) do not apply.

14           THE COURT:  Thank you.

15           Attorney Morabito, do you agree with that?

16           MR. MORABITO:  I agree that the government, as

17   part of a grand jury presentation, would certainly define

18   what constitutes "personnel" and would have to articulate

19   in the indictment why a particular defendant, Mr. Elshazly

20   or whoever, fits within that definition.  I don't think

21   the government's required to present defenses or anything

22   beyond that; for example, whether something falls within

23   the purview of the First Amendment.  So I disagree with

24   that, to the extent that Mr. Maguire was arguing that.

25           THE COURT:  Okay.  I think we're all on the same

1      page.  All right.  Thank you.

2                  So who is the government anticipating calling as

3      witnesses?

4                  MR. MORABITO:  Your Honor, the government is

5      calling one witness.  It's Chris Evans, special agent from

6      HSI, who is sitting in the conference room with me right

7      now.

8                  THE COURT:  And does the defense anticipate

9      calling any witnesses?

10                 MR. MAGUIRE:  We do not.

11                 THE COURT:  All right.

12                 And what about in terms of exhibits?  What

13     exhibits does the government intend to offer, if any?

14                 MR. MORABITO:  Your Honor, the government only

15     has two proposed exhibits.  Government Exhibit 1 would be

16     the complaint.  Government Exhibit 2 would be the

17     affidavit in support of the criminal complaint.

18                 MR. MAGUIRE:  Defense has no objection to those

19     exhibits.

20                 THE COURT:  All right.  So why don't we mark

21     those exhibits as full.  I should note that we received

22     electronic copies of them.  The complaint would be

23     Government's Exhibit 1.  And the complaint affidavit would

24     be Government's Exhibit 2.  I know they've also been filed

25     on the docket.  Give me one moment.

1              (Government's Exhibits 1 and 2 admitted in

2              evidence.)

3        THE COURT:  Okay, I have those available to me.

4        And I assume, Attorney Maguire, do you have

5 those available to you if you need to refer to them?

6        MR. MAGUIRE:  I do.

7        THE COURT:  Thank you.

8        All right.  Attorney Maguire, in your view, can

9 we proceed with the probable cause hearing?

10        MR. MAGUIRE:  We can.

11        THE COURT:  Thank you.

12        All right.  Attorney Morabito, I'll leave it to

13 you to call your first witness.

14        MR. MORABITO:  Thank you, Your Honor.

15        The government calls Christopher Evans, who is

16 obviously seated to the right of me, Your Honor.

17        THE COURT:  All right.

18        And Attorney Maguire, I should say that if at

19 any time you have any trouble hearing the witness or

20 hearing or seeing what's going on, just let me know, okay?

21        MR. MAGUIRE:  Thank you.

22        THE COURT:  All right.  I'm going to ask my

23 courtroom deputy to please swear in the witness.

24        I'm sorry, Tatihana, your audio is muted.

25

1                    CHRISTOPHER EVANS,

2          called as a witness, having been first duly

3          sworn, was examined and testified as follows:

4

5              THE COURT:  Can you state your name and spell

6    your last name for the record.

7              THE WITNESS:  My name is Christopher Evans,

8    E-V-A-N-S.

9              THE COURT:  You may be seated.

10             Attorney Morabito, you may proceed.

11             MR. MORABITO:  Thank you, Your Honor.

12

13                    DIRECT EXAMINATION

14   BY MR. MORABITO:

15   Q.   Good morning, Special Agent Evans.

16   A.   Good morning.

17   Q.   Would you tell the Court where you're employed?

18   A.   I'm a federal agent, a special agent with Homeland

19   Security Investigations located out of New Haven,

20   Connecticut.

21   Q.   How long have you been employed in this position?

22   A.   I've been an agent with HSI since 2008.

23   Q.   Okay.  And just very generally, what types of cases

24   have you investigated in that position?

25   A.   A whole myriad of cases that warrant federal

1    prosecution.  Job exploitation, counterterrorism, bulk

2    cash smuggling, money laundering, to name a few.

3    Q.   Do you have a current assignment?

4    A.   I'm currently assigned to the FBI's Joint Terrorism

5    Task Force also located out of New Haven, Connecticut.

6    Q.   And just, again, very generally, what

7    responsibilities do you have with the JTTF?

8    A.   I assist in combating or investigating cases that

9    involve terrorism as part of a task force.

10   Q.   Do you have any specialized training, just generally,

11   as a special agent?

12   A.   I do.  I've attended numerous trainings provided by

13   my parent agency or the FBI involving conducting

14   terrorism-related investigations.

15   Q.   Okay.  I'm going to draw your attention to why we're

16   here today.  Are you familiar with an investigation

17   involving Ahmad Khalil Elshazly?

18   A.   Yes, I am.

19   Q.   Do you see Mr. Elshazly today?

20   A.   Yes, I do.

21   Q.   And where is he?

22   A.   My view, he's the lower right, what would be the

23   sixth window in our video display here.

24              MR. MORABITO:  Can the record reflect that he's

25   identified the defendant, Your Honor?

1            MR. MAGUIRE:  That --

2            THE COURT:  If you could give a little more

3   information about him, describe him a little better.

4            THE WITNESS:  I see an individual sitting with a

5   blue protective mask, appears to have his longer hair

6   pulled back.  There's a white wall with a green wall, what

7   appears to be a green wall to his right.

8            THE COURT:  All right.

9            Attorney Maguire, I didn't mean to cut you off.

10            MR. MAGUIRE:  No objection.  I had the same

11   concern.  No objection.

12            THE COURT:  The record may reflect that the

13   witness has identified Mr. Elshazly.

14   BY MR. MORABITO:

15   Q.   Special Agent Evans, did you participate in the

16   investigation regarding Mr. Elshazly?

17   A.   Yes, I did.

18   Q.   Did your parent agency, HSI, do any type of workup on

19   Mr. Elshazly?

20   A.   Initially, yes.

21   Q.   Okay.  And were there other members of the JTTF

22   involved in the investigation?

23   A.   Yes, there were.

24   Q.   And just very generally, what other members are the

25   JTTF, just for the record?

    1   A.   The JTTF is comprised of multiple federal and local

    2   task force members to include the IRS, the Connecticut

    3   State Police, local PDs, members of the local police

    4   department.

    5   Q.   Okay.  And were you involved in the arrest of

    6   Mr. Elshazly?

    7   A.   Yes, I was.

    8   Q.   Just describe for the Court what your role was on

    9   that day.

   10   A.   I was there.  I was several blocks away from the

   11   actual arrest location.  I was there in a supportive

   12   capacity.

   13   Q.   And is it your understanding that Mr. Elshazly was

   14   arrested on December 15, 2019, without an arrest warrant?

   15   A.   That's correct.

   16   Q.   So it was a probable cause arrest?

   17   A.   Correct.

   18   Q.   Where did that happen?  What town?

   19   A.   It was in Stonington, Connecticut.

   20   Q.   And you just indicated that you weren't physically

   21   present when he was actually taken into custody; is that

   22   accurate?

   23   A.   That's correct.

   24   Q.   After Mr. Elshazly was arrested, did you do anything?

   25   A.   I assisted with the transport back to where his

1  post-arrest interview was conducted, and then prepared the

2  affidavits for the complaint.

3  Q.   Okay.  So you have in front of you Government's

4  Exhibits 1 and 2.

5       MR. MORABITO:  Which I believe they're full

6  exhibits now, Your Honor?

7       Thank you.

8       THE COURT:  Sorry about that.  Yes.  I'm trying

9  to mute myself so you're not hearing background.  I said

10 yes, they are full exhibits.

11      MR. MORABITO:  Thank you, Your Honor.

12 BY MR. MORABITO:

13 Q.   And I just want to draw your attention to

14 Government's Exhibit 2.  Would you put that in front of

15 you.

16      And that's the affidavit in support of the criminal

17 complaint?

18 A.   Yes, it is.

19 Q.   Okay.  And that's a document you just testified about

20 that you started to work on and prepare?

21 A.   That's correct.

22 Q.   Did anybody assist you in preparing that?

23 A.   Yes, they did.

24 Q.   Just very generally, who?  Not specific people, but

25 who helped you?

```
 1   A.   Other agents.  You know, case agents, individuals
 2   that were associated with the investigation.
 3   Q.   Okay.  And just very briefly before we move to the
 4   next day, did you also prepare another affidavit in
 5   support of either a search warrant or other search
 6   warrants?
 7   A.   Yes, I did.
 8   Q.   I want to draw your attention now to December 16, the
 9   day later, 2019.  Did you meet with Judge Spector to
10   obtain or to present the complaint for the arrest of the
11   defendant?
12   A.   Yes, I did.
13   Q.   Okay.  And again, looking at Government's Exhibit 1
14   and 2, do you recognize those documents?
15   A.   I do.
16   Q.   Okay.  And when you met with Judge Spector, did he
17   place you under oath?
18   A.   Yes, he did.
19   Q.   And did you swear under oath to the contents of the
20   affidavit and the criminal complaint?
21   A.   Yes, I did.
22   Q.   And that information that was contained in those
23   documents was true and accurate, to the best of your
24   knowledge?
25   A.   Yes, it was.
```

1    Q.   After you swore to both documents, did the Court have

2    you sign both the criminal complaint and the affidavit in

3    support of the criminal complaint?

4    A.   Yes, they did.

5    Q.   Okay.  And then did you review them again before your

6    testimony here today?

7    A.   I did.

8    Q.   And is it still your belief, to the best of your

9    knowledge, that the information contained within the

10   documents is true and accurate?

11   A.   Yes, it is.

12             MR. MORABITO:  Your Honor, can I just have one

13   moment?

14             THE COURT:  Yes.

15             MR. MORABITO:  Thank you.

16                  (Pause.)

17             MR. MORABITO:  Your Honor, I don't have any

18   further questions of Special Agent Evans.

19             THE COURT:  All right.  I'm going to turn it

20   over to Attorney Maguire for cross-examination.

21             MR. MAGUIRE:  Thank you.

22

23                     CROSS-EXAMINATION

24   BY MR. MAGUIRE:

25   Q.   Special Agent Evans, I think you just explained that

1   you are the principal author of this affidavit, is that

2   correct, Exhibit 2?

3   A.   That's correct.

4   Q.   Okay.  But there were other people who contributed as

5   well?

6   A.   That is correct also, yes.

7   Q.   Okay.  Can you go back through and tell me who else

8   wrote portions of this affidavit?

9            MR. MORABITO:  Your Honor, I object.  I don't

10  think it's relevant who else participated in or helped

11  prepare.  It's perfectly permissible for Special Agent

12  Evans to rely on --

13           THE COURT:  I'm going to overrule the objection.

14  I think it's fair cross-examination.

15           MR. MORABITO:  Thank you, Your Honor.

16  A.   The information contained within the affidavit comes

17  from the case file itself.  So there would have been

18  numerous individuals who, you know, submitted reports as

19  part of the investigation.  And so as a result of that, I

20  wouldn't be able to accurately or definitively say who

21  wrote which paragraph or who submitted information, you

22  know, that I ultimately obtained through review of the

23  case file.

24  BY MR. MAGUIRE:

25  Q.   So if you could, let's begin, if you could turn to

 1   paragraph 6 of Exhibit 2.

 2   A.   Okay.

 3   Q.   Now, this paragraph says that, "Beginning in

 4   approximately September 2018, and continuing to the

 5   present, Elshazly has expressed a desire to travel to

 6   'Sham' to join and fight on behalf of ISIS."  Is that

 7   right?

 8   A.   Yes, that's what it says.

 9   Q.   Okay.  Now, concerning the state of the criminal

10   complaint, if you could turn to Exhibit 1.  This has a

11   start date of the offense of September 2018; is that

12   correct?

13   A.   So, yeah.  So in Exhibit 1 it also states

14   "September 2018 to present."

15   Q.   And present at that time was December 16, 2019?

16   A.   Correct, yes.

17   Q.   You said before on direct that you arrested

18   Mr. Elshazly without a warrant; is that right?

19   A.   That's correct.

20   Q.   This offense had begun in September of 2018?

21   A.   Well, the investigation was initiated or the -- there

22   was suspicion of the offense originating in September of

23   2018, and then investigation obviously that took place.

24   Q.   The criminal complaint, Exhibit 1, says "I, the

25   complainant in this case, state that the following is true

1    to the best of my knowledge and belief.  On or about the

2    date(s) of September 2018 to present in the county of

3    New Haven and elsewhere in the District of Connecticut,

4    the defendant violated:  18 U.S.C. 2339B."  Does it not

5    say that?

6    A.    It does.

7    Q.    It does not?

8    A.    It does, yes.

9    Q.    So is it your position testifying today that

10   Mr. Elshazly violated Section 2339B in September of 2018?

11   A.    I stand behind the -- what's provided here in the

12   complaint.

13   Q.    Okay.

14   A.    As far as the date goes.

15   Q.    Could you point me to where in the complaint

16   affidavit there's an articulation of what Mr. Elshazly did

17   in September of 2018 that was a violation of

18   18 U.S.C. 2399B?

19   A.    Paragraph 13 that states the desire to travel to

20   Sham, which is referred to as the State or, better known,

21   ISIS.  He still had a desire to travel there for the

22   purpose of -- he wished to travel to Sham, travel to ISIS,

23   which is a designated foreign terrorist organization.

24   Q.    So you are testifying that a desire to travel to Sham

25   to join a terrorist organization is a crime?

 1  A.   No.  What I'm testifying to is that -- you were

 2  looking for something specifically in 2018.  And so that

 3  paragraph speaks to September 2018.

 4      Paragraph 3 also states that the affidavit does not

 5  contain every aspect of the case and what the government

 6  knows and is merely to establish probable cause.

 7  Q.   And that is specifically probable cause that

 8  Mr. Elshazly committed a crime beginning in September of

 9  2018; is that correct?

10  A.   Well, it states that we -- it's correct in the sense

11  that it states that we have evidence that beginning in

12  September 2018 up through the present that the defendant

13  violated 18 U.S.C. 2339B.

14  Q.   Is it fair to say you did not arrest Mr. Elshazly in

15  September of 2018?

16  A.   That's correct.

17  Q.   And prior to December 16 of 2019, you didn't go to a

18  court and say we believe we have probable cause to arrest

19  Ahmad Elshazly, please issue an arrest warrant?

20  A.   A probable cause was conducted on the dates of, which

21  is an authority that, as an agent, I and my colleagues

22  have.

23  Q.   If you could answer the question.  You did not go to

24  a judge and get a warrant, did you?

25  A.   Well, no, we did not obtain a warrant for the arrest,

1    correct.

2    Q.   If you could now turn to paragraph 8 of the complaint

3    affidavit.

4    A.   Okay.

5    Q.   And this lays out the statute, what you claim is the

6    statutory authority; is that correct?

7    A.   It speaks to Title 18 U.S.C. 2339B, yes.

8    Q.   And you quote what you state is the pertinent part of

9    that section?

10   A.   It states, in pertinent part, that a person -- it

11   reads "Title 18, United States Code, Section 2339B

12   prohibits, in pertinent part, a person from knowingly

13   providing 'material support or resources to a foreign

14   terrorist organization,' or attempting or conspiring to do

15   the same."

16   Q.   And now paragraph 9 further defines the term

17   "material support or resources"; is that right?

18   A.   It does.

19   Q.   And "material support or resources" broadly includes

20   three categories: property, services, or personnel; is

21   that right?  Rather, four, including property, services,

22   personnel, and transportation?

23   A.   Yeah, there's a fairly extensive list of items

24   contained in that.

25   Q.   So specifically does the complaint affidavit allege

 1    that Mr. Elshazly provided property to a terrorist

 2    organization?

 3    A.    No, it doesn't.

 4    Q.    Does it allege that he provided service?

 5    A.    No, it doesn't.

 6    Q.    Does it allege that he provided transportation?

 7    A.    No, it doesn't.

 8    Q.    Does it allege that he provided personnel?

 9    A.    I'm sorry, could you repeat the question?

10    Q.    But it does allege that he provided personnel; is

11    that correct?

12    A.    It states "personnel (1 or more individuals who may

13    be or include oneself)."

14    Q.    Is it your testimony that the facts of the affidavit

15    establish that Mr. Elshazly attempted to provide

16    personnel?

17    A.    Yes, that's correct.

18    Q.    But not these other categories?

19    A.    Well, the affidavit speaks to his multiple attempts

20    to travel and him being the personnel.

21    Q.    Could you point to me in the complaint affidavit

22    multiple attempts to travel?

23    A.    Well, a desire.  Multiple -- there were multiple

24    conversations or he expressed his desire to travel on

25    multiple occasions.

1    Q.   Is it your testimony that expression of a desire is a

2    violation of 18 U.S.C. Section 2339B?

3    A.   I'm not saying that expression or desire is a

4    violation of the statute.  What I'm saying is that he

5    expressed a desire but was concerned that he would be

6    caught or that the route that would allow him to travel or

7    the means to travel wasn't there.  And so that was why

8    it's laid out in the affidavit, there's multiple

9    expressions of an attempt to travel and there's also the

10   frustration with the inability to travel, more so to the

11   means aren't there as opposed to -- as opposed to a lack

12   of desire or willingness on his part.

13   Q.   Special Agent, are you familiar with the text of

14   18 U.S.C. Section 2339B?

15   A.   I have read it, yes.

16   Q.   In its entirety?

17   A.   Yes.

18   Q.   And in the complaint affidavit you included what you

19   believe the pertinent part of that statute?

20   A.   Yeah.  Well, once again, it's an affidavit.  It

21   doesn't encompass all aspects of investigation, and so

22   it's, you know, pertinent part.

23   Q.   Is it fair to say the affidavit includes what's

24   needed to support probable cause, in your view?

25   A.   Well, the affidavit clearly supports probable cause,

1    but it's not all inclusive as far as the investigation

2    goes.

3    Q.    It doesn't, for example, include the portion of

4    Section 2339B that limits the definition of "personnel,"

5    does it?

6    A.    Well, it speaks to the definition of "personnel."

7    Q.    In your view, does it provide a complete and accurate

8    definition of "personnel," as used in that statute?

9    A.    I believe it does.

10   Q.    Turning again to paragraph 6 regarding the start date

11   of September 2018, could you tell me why did the

12   government or why did the agents not arrest Mr. Elshazly

13   before December 16, 2019?

14   A.    Why wasn't he arrested prior?

15   Q.    That's correct.

16   A.    Well, I mean, you have to have probable cause to

17   arrest an individual.  Part of an investigation is to look

18   at the facts and make a determination.  And probable cause

19   was established, and he was arrested.

20   Q.    Turning now to paragraph 27 of Exhibit 2, this

21   paragraph states, "During the same meeting, Elshazly said,

22   '... I want to go to the caliphate and fight there.  I can

23   kill maybe... like a hundred kaffir.  I can kill them.  A

24   hundred kaffirs.  If I do something here how many kaffirs

25   could I kill?  One, two, three and then I get shot and I

1   die.  It is more benefitting if I go there, I could kill

2   more and get more faithful rewards.'"  Is that correct?

3   A.   That's what it says, yes.

4   Q.   To be clear, Mr. Elshazly has never attacked anyone

5   in the United States on behalf of ISIS, is that right, to

6   your knowledge?

7   A.   Not that I know of, no.

8   Q.   To your knowledge, he's never coordinated with agents

9   or members of ISIS here in the United States?

10  A.   I don't know.

11  Q.   He's never sent money to ISIS?

12  A.   I don't know.  Once again, I assisted in the

13  investigation.  I don't know all aspects of the

14  investigation.  So I can't -- I cannot definitively say he

15  has.  But I can't say he hasn't.

16  Q.   You're testifying here today you cannot say that

17  Mr. Elshazly has ever sent money?

18          MR. MORABITO:  Your Honor, if I could, I would

19  just object because I think it's beyond the scope of the

20  complaint.  And this would bring Special Agent Evans

21  actually to an area that he wouldn't be permitted at this

22  point to testify about because it may involve information

23  that's classified.

24          MR. MAGUIRE:  So I think --

25          THE COURT:  I'm going to pause there.

1          Attorney Maguire, is there a way to rephrase the

2  question?

3          MR. MAGUIRE:  I think there may be.

4          THE COURT:  All right.  Why don't we see if we

5  can make it work.

6  BY MR. MAGUIRE:

7  Q.   To be clear, Special Agent Evans, you were not

8  claiming that a basis for probable cause in this case is

9  that Mr. Elshazly has, for example, sent money to ISIS?

10          THE COURT:  Attorney Morabito, that seems like

11  an acceptable way of asking; is that fair?

12          MR. MORABITO:  I think, yes, Your Honor, as long

13  as Mr. Maguire means as outlined in the affidavit.  For

14  purposes of what's in the affidavit, I think that's a

15  totally fair question.

16          THE COURT:  All right.  The witness can answer.

17  A.   The affidavit doesn't address monetary support.

18  BY MR. MAGUIRE:

19  Q.   Again, for purposes of establishing probable cause,

20  the affidavit does not allege that Mr. Elshazly ever had

21  contact with an actual member of ISIS, does it?

22  A.   There's a paragraph in here that addresses it.  I'm

23  trying to find it.

24      So paragraph 48, midway through the paragraph,

25  Mr. Elshazly stated that he had previously sent a picture

1   of his passport to someone online who said they were in

2   Sham and were a fighter with dowlah, i.e., ISIS.

3   Q.   And does the complaint affidavit allege that that

4   person ever responded to Mr. Elshazly?

5   A.   The affidavit doesn't speak to that.  It just states

6   that he reached out to members who identified themselves

7   as being ISIS members.

8   Q.   Your testimony is that it is multiple individuals

9   that he reached out to in the affidavit?

10  A.   Well, in this case he states -- he states that he

11  sent it to someone online.  There are other paragraphs

12  where it speaks to his understanding that the routes to

13  Syria had been closed, and so obviously those were through

14  conversations with others as well.  And those routes

15  would, you know, be through Syria or ultimately to Syria

16  to join and fight with ISIS or to meet up with ISIS.

17  Q.   For purposes of establishing probable cause, is it

18  your testimony that Mr. Elshazly ever received instruction

19  from anyone affiliated with ISIS?

20  A.   That's not in the affidavit.

21  Q.   And so it's not something you're presenting as a

22  basis for probable cause?

23  A.   That's correct.

24  Q.   Is it also fair to say that the affidavit does not

25  establish Mr. Elshazly requested guidance from anyone

1  affiliated with ISIS?

2  A.   Once again, that same paragraph where he's reaching

3  out to an individual who identifies himself as a member of

4  ISIS and sending a picture of his passport for travel

5  purposes I think could easily be looked at as seeking

6  guidance.

7  Q.   Is it your testimony that it is your belief, based

8  upon your knowledge and experience, that Mr. Elshazly was

9  in fact seeking guidance?

10  A.   I'm stating that he said in 2017 he sent a picture of

11  his passport to someone online who said they were in Sham

12  and were a fighter with dowlah.  I think that speaks to

13  itself.

14  Q.   Other than paragraph 48, does the affidavit identify

15  any instances in which Mr. Elshazly communicated in any

16  way with a member of ISIS?

17  A.   No, it does not.

18  Q.   Turn your attention to paragraph 30 of Exhibit 2.

19       That paragraph states, "On or about October 28, 2019,

20  Elshazly continued the conversation on OMA-3 with CHS 3.

21  Speaking about the death of al-Baghdadi, Elshazly said, 'I

22  want to leave before I lose my chance To defend the

23  ummah.'  He continued, 'I'm sorry I'm speaking to [sic]

24  much forgive me Ahki.'"  Is that correct?

25  A.   (Video interruption.)

1    Q.    I'm sorry, I missed the audio there.

2    A.    Yes, that is correct.

3    Q.    Now, ummah, as noted in Footnote 7 of Exhibit 2,

4    means the worldwide Muslim community; is that correct?

5    A.    That is correct, yes.

6    Q.    In your testimony here today, is it your

7    understanding that "ummah" means the worldwide Muslim

8    community?

9    A.    (Video interruption.)

10   Q.    Sorry, I missed that.

11   A.    That is correct.

12   Q.    Is it fair to say that the worldwide Muslim community

13   is broader than ISIS?

14   A.    Yes, it is.

15   Q.    To be clear, is your testimony that leaving the

16   country itself is a violation of 18 U.S.C. Section 2339B?

17   A.    Attempting to leave the country for a foreign

18   terrorist organization, is that a violation of 2339B; is

19   that what you're asking me?

20   Q.    Yes.

21   A.    Yes, making an attempt to travel for the purposes of

22   joining or fighting with a designated terrorist

23   organization is a violation.

24   Q.    Turning to paragraph 45 of Exhibit 2, this discusses

25   broadly the building of weapons, correct?

1   A.   Broadly.  It discusses more specifically the building

2   of rockets and, you know, how grenades work, how a rifle

3   works.  So it's munitions and means to -- and to launch

4   those munitions through a weapon or some sort of a rocket

5   system.

6   Q.   And it alleges that Elshazly said we can build this

7   stuff and it is not that hard?

8   A.   Which paragraph specifically are you speaking to?

9   Q.   Continuing on paragraph 45.

10  A.   Okay.

11  Q.   Now, for purposes of probable cause, does the

12  affidavit allege or do you now testify that Mr. Elshazly

13  actually possessed the technical capacity to build the

14  weapons described?

15  A.   Well, by his own words, he stated that it was easy to

16  do and he felt comfortable doing it.

17  Q.   In your training and experience, is it easy to build

18  these weapons?

19  A.   I don't know what Mr. Elshazly's technical capacity

20  is, so I can't speak to whether or not he could or

21  couldn't do them.  My experience has shown me that people

22  that are often discounted as being not capable of doing it

23  are very capable of doing it.  So I wouldn't be in a

24  position to make a determination on whether or not he

25  could or couldn't do it.  I do know that he put an

1   extensive amount of research as evidenced with the two

2   paragraphs of links that he sent and the videos.  And so

3   based on that amount of time and that amount of effort,

4   it's very conceivable that he could have constructed any

5   one of those gadgets.

6   Q.   Have you reviewed these videos?

7   A.   I have not, no.

8   Q.   But you're testifying that someone who viewed these

9   videos could build those devices?

10  A.   I'm testifying that the possibility is there.

11  There's a lot of information out on the Internet and

12  there's a lot of information provided by YouTube, and

13  depending upon the videos and how detailed they are, you

14  can walk away knowing how to construct or how to build a

15  lot of things nowadays.

16  Q.   But you did say you have not seen these videos?

17  A.   I did say that, that's correct.

18  Q.   And so other than Mr. Elshazly's own words here, what

19  basis is there in the affidavit for concluding he has the

20  technical capacity to build any of these devices?

21  A.   Well, he stated that he found them to be easy and he

22  found that obtaining the materials itself would be easy,

23  and had the willingness and the desire to do so, if

24  needed.

25  Q.   Does the complaint affidavit allege that Mr. Elshazly

1  had any specific contacts in Turkey for the obtaining of

2  weapons parts?

3  A.   That is not contained in the affidavit, no.

4  Q.   And to the extent that you were testifying for

5  purposes of providing probable cause -- I'll withdraw that

6  question.

7       So it's fair to say, for purposes of this hearing,

8  that there is not evidence in the record showing that

9  Mr. Elshazly had any contact in Turkey for the purpose of

10  making weapons?

11  A.   That's not contained in the complaint, no.

12  Q.   And for purposes of establishing probable cause here

13  today, is there any evidence that Mr. Elshazly had any

14  plans to -- for purposes of probable cause here today,

15  does the complaint affidavit or your testimony provide any

16  indication that Mr. Elshazly had contacts in Turkey who

17  were able to bring -- (video interruption) -- to Syria?

18  A.   Can you repeat the question?  You broke up there a

19  little bit.

20  Q.   Sure.  Does the complaint affidavit describe any

21  contacts Mr. Elshazly had in Turkey who could bring him to

22  Syria?

23  A.   He was traveling to Turkey with the assumption that

24  he was meeting an individual in Turkey.

25  Q.   And that individual, was that the one who was

1   affiliated with ISIS?

2   A.   Well, the purpose for his trip was to meet with ISIS

3   or to join ISIS.

4   Q.   I'll repeat the question.  Is it the allegation of

5   the complaint affidavit that the person Mr. Elshazly was

6   to meet in Turkey, identified as a CHS in the complaint

7   affidavit, was a member of ISIS?

8   A.   No, he's not designated or identified as an ISIS

9   member.

10  Q.   Nor is he someone who held himself out to

11  Mr. Elshazly as a member of ISIS?

12  A.   No, he was there to assist with his transfer or

13  transportation to join ISIS.

14  Q.   Does the complaint affidavit describe anything about

15  how that transfer was to take place?

16  A.   Yes, it does.

17  Q.   Can you point that out in the affidavit?

18  A.   Well, the transfer, I mean, he was going to be

19  transferred on a fishing boat to a commercial -- or to a

20  containership, which the containership would ultimately

21  travel to Turkey.

22  Q.   To Turkey, not to Syria?

23  A.   Correct.  Turkey for the purpose of going to Syria.

24  Q.   And where in Turkey?

25  A.   I don't believe it specifically says where in Turkey.

1    Q.   The complaint affidavit does not allege that he was

2    going to a part of Turkey controlled by ISIS, assuming

3    such a thing existed?

4    A.   Yeah, I'm not aware of any of those areas.  He was

5    traveling -- his intention was to travel on a

6    containership to Turkey for the purpose of joining and,

7    per the paragraph that you pointed out earlier,

8    paragraph 27, to be able to kill hundreds of kaffir.

9    Q.   Is killing hundreds of kaffir in itself a violation

10   of 18 U.S.C. 2339B?

11   A.   Killing for a terrorist organization?

12   Q.   No, the specific question.

13   A.   Could you repeat the question?  I missed it there.

14   I'm confused as to what you're asking.

15   Q.   And I want to try to avoid a hypothetical, but you

16   indicated that Mr. Elshazly stated that he wished to

17   travel to Sham to kill kaffir, correct?

18   A.   Correct.

19   Q.   Absent coordination with ISIS, is it your testimony

20   that that intent is sufficient to satisfy the intent

21   required for 2339B?

22   A.   Well, he was offering himself, i.e., his person, to

23   fight and kill on behalf of ISIS.  He sought travel for

24   the sole purpose of killing for ISIS.  Once again, in that

25   paragraph he didn't feel it was fulfilling enough to kill

1    three or four people in the U.S. and so therefore he

2    wanted to travel to Syria to join ISIS where he could kill

3    a hundred kaffirs, or the nonbelievers, and that would be

4    more rewarding for him.

5    Q.   Is your testimony that only members of ISIS can kill

6    nonbelievers?

7    A.   I mean, conceptually anyone can kill anyone.  ISIS --

8    ISIS does kill nonbelievers I think they identify as the

9    kaffir.

10   Q.   And so do other organizations?

11   A.   I mean, once again, conceptually anyone can kill

12   anyone.  I don't understand the question.

13   Q.   Based on your training and experience, other than

14   ISIS, in Syria are there any groups or individuals who

15   kill nonbelievers?

16            THE COURT:  So I think --

17            MR. MORABITO:  Your Honor, I'm going to --

18            THE COURT:  I'm not going to require an

19   objection on this.  I'm going to ask Attorney Maguire to

20   confine your cross-examination to the content of the

21   complaint affidavit, and let's try to avoid general

22   questions about experience, training and experience, or

23   hypotheticals, unless they really do relate to statements

24   in the affidavit.

25            I should note I think, Attorney Maguire, what

1  you were asking was -- I think what you were asking was is

2  simply killing individuals not on behalf of a terrorist

3  organization a violation of the statute; is that what you

4  were asking?

5          MR. MAGUIRE:  Generally, yes.

6          THE COURT:  I'm not sure if you had an answer to

7  that question.  If you want to ask it that way, that would

8  be permissible.

9          MR. MAGUIRE:  Certainly.

10  BY MR. MAGUIRE:

11  Q.   As you just heard, is killing nonbelievers not on

12  behalf of a terrorist organization a violation of

13  18 U.S.C. 2339B?

14  A.   No, I don't believe it is.  It would fall under a

15  separate section.

16  Q.   What section is that?

17  A.   Offhand, I don't know what the federal statute is for

18  murder.

19  Q.   Turning to paragraph 53, this describes the events of

20  September 14, 2019?

21  A.   Yes, it does.

22  Q.   It explains Mr. Elshazly paid $500 to get on a

23  fishing boat that would take Elshazly to a containership

24  that was destined for Turkey?

25  A.   That's correct.

```
 1    Q.   Was there an actual boat there?

 2    A.   An actual boat where?

 3    Q.   At the dock.

 4    A.   At the arrest location?

 5    Q.   Yes.

 6    A.   It's a marina.  So there were several boats.

 7    Q.   So there was a particular individual identified in

 8    footnote 10 of the affidavit as an FBI employee posing as

 9    a boat captain?

10    A.   That's correct.

11    Q.   Was there at that time an actual boat associated with

12    that individual?

13    A.   I don't believe there was, but I can't definitively

14    say yes or no.

15    Q.   But Mr. Elshazly never got onto a boat?

16    A.   That's correct.

17    Q.   And he wasn't arrested about to step onto a boat?

18    A.   That's correct.  As it states in paragraph 54, after

19    exiting the vehicle and walking towards the individual

20    that he knew to be the boat captain to hop on the boat for

21    transport to the containership, he was arrested prior to

22    meeting up with the individual who was the FBI employee

23    posing as a boat captain and the individual he believed to

24    be the boat captain who was going to facilitate his

25    travel.
```

1    Q.    So at the point he was arrested, Mr. Elshazly could

2    have decided not to get on the boat, correct?

3              MR. MORABITO:  Objection, Your Honor.  I don't

4    think the witness can testify about what Mr. Elshazly

5    could have done or would have done.  He can only testify

6    about what actually happened.

7              THE COURT:  I think, Attorney Maguire, the

8    question simply may need to be reworded.

9              MR. MAGUIRE:  Sure.

10   BY MR. MAGUIRE:

11   Q.    Mr. Elshazly was arrested on dry land, correct?

12   A.    That's correct, yes.

13   Q.    Not on the open seas, correct?

14   A.    Correct.

15   Q.    So at the point of arrest, time remained before

16   Mr. Elshazly would have stepped on a boat had he not been

17   arrested?

18   A.    Time did remain.  He had expressed on multiple

19   occasions prior to that of his desire to travel and his

20   eagerness to travel.  It's noted in the affidavit that he

21   was so excited and so eager to travel that he showed up

22   for what he thought was a meeting early, he confused the

23   time.  And then each time he showed up, he was traveling

24   with bags.  At the time of arrest, when he departed the

25   vehicle, all indications -- there was nothing to suggest

1   that he was having any sort of second thoughts.  He walked

2   directly towards the individual that he believed to be the

3   boat captain that was going to facilitate his travel.  So

4   based on his comments and based on his actions at the time

5   of, I can only make a determination that I believe he

6   intended to travel.  Once again, I can't get inside his

7   head, but his comments, his actions suggest otherwise.

8   Q.   You just said that Mr. Elshazly was excited and

9   therefore confused the time of the meeting.  What is the

10  evidence for the fact that he was excited and therefore

11  confused the time of the meeting?

12  A.   Couple sentences in the affidavit.  So let me get

13  those for you so I can point them out.

14       So the particular meeting that I was referencing is

15  in paragraph 45, then gets into 46 where it appears that

16  there was confusion on the time.  And so the meeting time

17  was 12:00 p.m.  Mr. Elshazly appeared to think it was

18  12:00 a.m.  So midnight as opposed to noon of the

19  following day.  And by his own admission, showed up with

20  his bags at the midnight meeting for the purpose of travel

21  only to turn around and show up to the following meeting

22  once again with his bags for the purpose of travel.

23       In paragraph 47 he states that "we should just go."

24  And "I know what I want to do, I want to go..."

25       When asked about -- paragraph 52, when asked about

```
 1    the cash aspect to pay for facilitation of his travel, he
 2    says he has the cash all ready, "so I'm ready."
 3    Q.    He, in fact, paid that cash?
 4    A.    He did, yes.
 5    Q.    That's the $500?
 6    A.    Five $100 bills.
 7    Q.    Had Mr. Elshazly in the marina said, "I actually
 8    don't want to go," and turned around to leave, would he
 9    have been arrested?
10              MR. MORABITO:  Objection, Your Honor.  It's a
11    hypothetical.
12              THE COURT:  I'm going to sustain the objection.
13    I guess I'm not really as concerned about the
14    hypothetical, Attorney Maguire, as I am about how this
15    falls within the scope of cross.  And so I guess maybe if
16    you want to rephrase the question.  I'm just not sure what
17    you're trying to ask as relates to whether the statements
18    in the affidavit establish probable cause.
19              MR. MAGUIRE:  The complaint alleges an attempt,
20    which requires both intention and substantial step.  And
21    the question I think may be one that starts getting us
22    into legal territory, and so I think that I will leave
23    there.
24              What I'd like to request, though, is I have no
25    further questions, but I do -- if I can, I would like to
```

1  consult with Mr. Elshazly who may have additional thoughts

2  or --

3               THE COURT:  Sure.

4               I should have said at the outset to both

5  attorneys that I will permit brief closing arguments when

6  we're done with evidence.  So to the extent that you

7  wanted to make a point that you weren't able to make, for

8  example, Attorney Maguire, during cross, you're certainly

9  welcome to make that point in argument.

10              I think it's Mr. Flathers who has control at the

11  moment.  If he could place Attorney Maguire and

12  Mr. Elshazly in a breakout room.

13              Tatihana, it looks like you're the host.  Why

14  don't you transfer the host to me and I'll see if I can do

15  it.

16              THE DEFENDANT:  Hey, I think if you click on

17  breakout room --

18              MR. MAGUIRE:  Wait a minute.  We'll talk

19  privately in a moment.

20              THE CLERK:  Judge, let me know if you need me to

21  message Michael.

22              THE COURT:  I think I did it, I'm not sure.

23  We'll find out.

24              MR. MAGUIRE:  Okay, thank you.

25              THE COURT:  No problem.

1                        (Pause while Attorney Maguire and defendant

2                            in breakout room.)

3              THE COURT:  Did you have any further questions

4    on cross-examination?

5              MR. MAGUIRE:  I do not.

6              THE COURT:  Attorney Morabito, did you have any

7    questions on redirect?

8              MR. MORABITO:  I don't, Your Honor.  Thank you.

9              THE COURT:  All right.  I will excuse the

10   witness from testifying.

11             And I'm going to allow you all to make brief

12   closing arguments.  I think it would be helpful to the

13   Court if, to the extent possible, when you're making the

14   arguments, you can address the elements of the offense you

15   believe they have either been established or haven't been

16   established.  I'll first ask the government to begin.

17             MR. MORABITO:  Thank you, Your Honor.

18             As Your Honor knows, the standard is probable

19   cause.  I'm going to start with whether the jurisdictional

20   requirements have been met or probable cause standard has

21   been met.

22             Here, the complaint or the affidavit in support

23   of the complaint sufficiently alleges that Mr. Elshazly is

24   a national of the United States.  Additionally, it

25   sufficiently alleges throughout that the offense occurred,

1    in whole or in part, within the United States.

2            And I guess to the extent Your Honor wants me to

3    point to the specific paragraphs, I can, to the extent

4    possible, but I'll defer if you want me to do that.

5            THE COURT:  It would certainly be helpful to the

6    Court.

7            MR. MORABITO:  I think paragraph 6 in Background

8    and Overview on page 2 of Government's Exhibit 2

9    sufficiently alleges that Mr. Elshazly is a United States

10   citizen residing at that time in West Haven, Connecticut.

11   Additionally, throughout the affidavit in support in

12   Government's Exhibit 2 is indicative that the events were

13   occurring within the United States.

14           I also think, Your Honor, the evidence is

15   sufficient for a finding of probable cause that the

16   offense occurred in or affected interstate or foreign

17   commerce.  You have multiple references to the use of

18   online apps by Ahmad Elshazly and other individuals in

19   support of his intention to leave the United States and

20   fight on behalf of ISIS.

21           You also have the substantial steps taken by

22   Mr. Elshazly in arriving at the marina at the meet

23   location to what he believed was to get on a boat, be

24   smuggled on a boat and travel to Turkey.  So I think, from

25   a probable cause standing, that element is fully

1  satisfied.

2         As to what I had identified as element two, that

3  is that Mr. Elshazly knew that the organization was a

4  designated terrorist organization or that the organization

5  had engaged in or was in engaging in terrorist activity or

6  terrorism, I would note, Your Honor, I think the complaint

7  sufficiently establishes facts showing probable cause on

8  its own, but I think the Court can take judicial notice of

9  the fact that ISIS is a designated terrorist organization,

10 but additionally there are statements and in an

11 organization that's engaged in terrorist activity or

12 terrorism.

13        Nonetheless, the complaint affidavit -- bear

14 with me, Your Honor -- indicates at paragraphs 10 and 11

15 where it identifies the fact that ISIS is a foreign

16 terrorist organization.  But it further identifies the

17 fact that, in paragraph 12, that al-Baghdadi was the emir

18 (leader) of ISIS until his death on or about October 27,

19 2019.  After al-Baghdadi's death, ISIS announced that

20 Al Qurashi was the new emir.

21        Within the complaint affidavit there are

22 references -- and I will point Your Honor to them --

23 paragraph 19 of Government's Exhibit 2, on or about

24 March 14, 2019, Elshazly told CHS 2 our leader al-Baghdadi

25 told us to do one of three things, and he lists those

1   things.

2            Additionally, in paragraph 20, the affidavit in

3   Government's Exhibit 2, on March 21, 2019, CHS 2 joined

4   Elshazly's group chat on OMA-2 along with other

5   participants.  Elshazly led CHS 2 in pledging bayat.

6   Bayat is defined as meaning to pledge fealty or allegiance

7   to ISIS.  So that bayat was recorded, as indicated in the

8   complaint affidavit, paragraph 20, again where

9   Mr. Elshazly is helping CHS to pledge his allegiance to

10   al-Baghdadi and ISIS.

11            Additionally, Your Honor -- if you just bear

12   with me, I'm just going through this as I talk, so I

13   apologize -- Mr. Elshazly indicates, again, in

14   paragraph 27 his desire to travel and kill the kaffir.

15            Additionally, in paragraph 30 it says "On or

16   about October 28, 2019, Elshazly continued the

17   conversation on OMA-3 with CHS 3.  Speaking about the

18   death of al-Baghdadi, Elshazly said 'I want to leave

19   before I lose my chance To defend the ummah.'"  On

20   cross-examination of Special Agent Evans, Mr. Maguire and

21   Special Agent Evans -- in response to a question from

22   Mr. Maguire, Special Agent Evans indicated "ummah" means

23   the worldwide Muslim community.  What he didn't ask him,

24   in further paragraphs in the complaint, including

25   paragraph 33, when Elshazly was asked what his life would

 1   be like in Sham -- that is, being there with ISIS --

 2   Elshazly responded "a killer, Inshallah."  More

 3   specifically, he wanted to be a killer for ISIS.

 4           He further, in paragraph 36, on October 31,

 5   2019, sent CHS 3 a pledge of allegiance, again the bayat,

 6   to the new leader of ISIS, saying "I pledge my

 7   allegiance... to the Khilafa (the successor of the

 8   leadership) of the muslims" and then "Al Qurashi."

 9           I think there are other instances, Your Honor,

10   but I think, as far as for a probable cause finding,

11   there's more than enough evidence -- more than enough

12   allegations to support that finding as to that element.

13           And then finally, Your Honor, as to the first

14   element, that is whether Mr. Elshazly knowingly provided

15   material support or resources to a foreign terrorist

16   organization, again, the allegation in the complaint and

17   in the affidavit is that he attempted to provide himself

18   to ISIS by traveling -- by smuggling himself on a fishing

19   boat because he believed, as outlined in the complaint

20   affidavit, that he could not fly, so he was willing to

21   smuggle himself on a fishing boat, get himself to Turkey.

22   He was prepared to either make weapons, rockets,

23   et cetera, as was outlined by Special Agent Evans, on

24   behalf of ISIS or, as I just indicated, to go to Sham,

25   Syria, and fight on behalf of ISIS as a killer.

1          I think there are numerous instances within the

2     affidavit that make clear that the words, statements of

3     Mr. Elshazly, coupled with his conduct in paying $500,

4     again, to be smuggled on a fishing boat to get to Turkey

5     to fight for ISIS, the fact that he had questions again

6     within the search warrant -- excuse me, the complaint

7     affidavit in paragraph 53 when he paid the $500, he had

8     questions about what should I do with my car.  And

9     Mr. Elshazly, as outlined in the complaint affidavit,

10    indicates on his own that he's going to leave the car

11    there and tape the keys under the tire or the seat --

12    underneath it so that a family member could retrieve it.

13    He then shows up at the designated meet location, goes

14    with other individuals to the place where he believes he's

15    going to be taken, smuggled overseas to fight on behalf of

16    ISIS, gets out of the car.  The affidavit fully supports

17    the fact that Mr. Elshazly attempted, that is took

18    substantial steps, to provide material support, again

19    himself, to a foreign terrorist organization, here ISIS.

20          Your Honor, could I just have one moment?  I

21    just want to look at one thing, if that would be okay.

22          THE COURT:  Yes, no problem.

23              (Pause.)

24          MR. MORABITO:  I think, Your Honor, unless the

25    Court has specific questions of me, I think the complaint

1    affidavit fully supports a finding of probable cause here

2    for the charge.

3          I would note -- the only other point I would

4    note is that Mr. Maguire cross-examined Special Agent

5    Evans some questions about the offense, could you have

6    arrested him on September 20, 2018, is it a violation as

7    of September 2018.  Government's Exhibit 1 says, "On or

8    about the date(s) of September 2018 to present."  He

9    wasn't arrested in September of 2018.  So the Court's not

10   looking at whether he could have been or should have been

11   or should not have been arrested in September of 2018.

12   The Court is looking at whether there's probable cause to

13   support the arrest at the time it occurred, which here

14   it's December of 2019.

15         So again, I think the affidavit as well as the

16   testimony today fully supports a finding of probable cause

17   for the offense in this particular case.

18         So unless Your Honor has specific questions of

19   me, I would defer everything I just said into the

20   complaint affidavit in Government's Exhibit 2.

21         THE COURT:  All right.  I'll turn it over to

22   Attorney Maguire to make whatever arguments you'd like to

23   make.

24         MR. MAGUIRE:  Thank you, Your Honor.

25         I'll begin with the government's comments about

1    the September 2018 date.  I think that date really is

2    significant because it shows that the government takes an

3    extraordinarily and very incorrectly broad view of what

4    this statute potentially criminalizes.  I think that prior

5    to -- I think December 14 may have been the date.  Prior

6    to December 14th of 2019, I think, based on everything

7    we've heard, there's no question there wasn't probable

8    cause, that Mr. Elshazly had not committed an offense

9    covered by 18 U.S.C. 2339B, and that there's a question

10   for the Court now about whether what happened on that

11   date.  But again, I think it's an easy question prior to

12   that.

13          There are really two problems here that the

14   government overlooked.  And the first of them is what I

15   highlighted at the very beginning of this hearing that is

16   missing from the complaint affidavit, which is the

17   important limiting language of the statute and

18   specifically the statute's provision regarding personnel.

19          In order to avoid constitutional problems and in

20   order to be properly tailored to be clear, again, to avoid

21   First Amendment problems, to avoid void for vagueness

22   problems, the statute excludes anyone who isn't shown to

23   be working under that terrorist organization's direction

24   or control or organizing.  Individuals who act entirely

25   independently of the foreign terrorist organization to

1  advance its goals or objectives shall not be considered to

2  be working under the foreign terrorist organization's

3  direction.

4         So what this leaves out is people who may be

5  very ideologically sympathetic to an organization to

6  believe the organization is doing the right thing in the

7  world, who want to see that organization succeed, maybe

8  even want to take action that would help that organization

9  succeed.  The statute does not cover that and explicitly

10  does not cover that.

11         And the problem for the government here is, as

12  we heard, neither the complaint affidavit nor any

13  testimony suggests that Mr. Elshazly coordinated with

14  ISIS, with any member of ISIS, with anyone he believed to

15  be a member of ISIS.  There is no testimony that anyone

16  affiliated with ISIS sent Mr. Elshazly a message saying do

17  this.  There's no evidence that he reached out and said

18  "hey, what should I do?" and let alone that he got an

19  answer.  All the government is pointed to is a very

20  fleeting reference to Mr. Elshazly having sent a passport

21  photo to someone who may have been a fighter with ISIS.

22  That isn't coordination.  There isn't communication.

23  There is no one in this entire case who is affiliated with

24  ISIS or at least in terms of what the evidence is before

25  the Court.  That includes anyone on these online chat

1    rooms.  So the government had said, well, Mr. Elshazly was

2    involved in the swearing of the bayat.  What's important

3    here is there is no evidence that anyone in that chat room

4    was actually a member of ISIS.  And so what the government

5    is missing is ISIS.

6           What the government puts forward is more

7    persuasive evidence for probable cause purposes of

8    sympathy, of ideology, of a sense of affinity.  And even

9    if -- I should be clear.  Even if what the government

10   showed is that Mr. Elshazly's acts were enough to say, you

11   know what, he might even count as a member of ISIS, which

12   we disagree with, the Supreme Court has said -- and I'm

13   quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1,

14   18, "Section 2339B does not criminalize mere membership in

15   a designated foreign terrorist organization.  It instead

16   prohibits providing material support to such a group."

17          At page 36 of that same opinion, the

18   Supreme Court articulates what section (h) of the statute

19   means is that "Finally, and most importantly, Congress has

20   avoided any restriction on independent advocacy or indeed

21   any activity not directed to, coordinated with, or

22   controlled by foreign terrorist groups."

23          This statute is about direct links to a specific

24   terrorism group related to direction, coordination, or

25   control.  There is nothing in this affidavit that suggests

1   that any communication that looks anything like that

2   actually happened.  So I think that's the first fatal

3   problem here is that there's no nexus.

4            The other problem here is that the government

5   falls short of what it needs to prove attempt liability.

6   And this gets to why I think that prior to December 14 the

7   question of probable cause is very easy.  I don't think

8   there's anything that the government alleges that

9   Mr. Elshazly did prior to that date.  The question is

10  whether essentially buying a ticket for a boat not to

11  Syria, but to Turkey, is a sufficient substantial step to

12  turn what was not an attempt into an attempt.  Again, I

13  think there's some important problems here.

14           So again, we're in the background of there is no

15  ISIS, that Mr. Elshazly is not at the behest of someone

16  identified with ISIS, getting on an ISIS-controlled boat,

17  nor is he destined directly for any territory controlled

18  by ISIS.  Instead, it appears that the plan is that he's

19  going to leave the country, according to the government,

20  and he's going to go to Turkey.  And what happens from

21  there, frankly, in details is entirely unclear.  There are

22  no allegations of any plan that brings Mr. Elshazly across

23  the border into Syria.  Certainly there's no allegation of

24  an organization in Turkey that is ISIS affiliated that

25  he's going to meet with.  There is talk of this weapons

1  building.  There is no allegation of any actual weapons

2  building capacity or any specific weapons building plan,

3  especially not one directly affiliated with ISIS.

4         And to be clear, again, going back to the issue

5  that we have of what 2339B really covers, Mr. Elshazly

6  could well have intended to build a weapon and blow things

7  up and blow things up in a manner that he expected would

8  help ISIS.  But if he did that without actually

9  coordinating with ISIS, without direction from ISIS, the

10  statute explicitly excludes that sort of conduct.  And so

11  even if Mr. Elshazly had gotten on the boat, the end of

12  that journey is still a long way from satisfying the

13  elements of the statute.  It's a long way, frankly, from

14  Syria.  There are a whole lot of steps, steps that could

15  easily be reversed, going from a NATO country across the

16  border into Syria to ISIS-controlled territory and,

17  frankly, a whole lot of steps left to go.

18         And even looking at the step that the government

19  alleges, Mr. Elshazly didn't actually take that step.  The

20  government agent believes that he would have.  But even

21  there, the government didn't wait until Mr. Elshazly took

22  an irrevocable or less revocable step of getting on a boat

23  and being on the water, kind of hard to turn back from

24  there, particularly if he's gotten all the way to a

25  containership.  Instead, he's at a place of basically

1   having purchased a ticket.  And the government alleges his

2   ideology and his affect suggested to them, well, he was

3   going to follow through, he was going to do future things.

4   The problem again is he didn't do them.  He didn't even

5   get on a boat, specifically didn't get to Turkey, didn't

6   go anywhere from Turkey.  And in all of this, there is no

7   ISIS.  Leaving the country is not a crime.  As I've said,

8   even committing violence in the Middle East not

9   coordinated with ISIS is not a crime.

10           And I think that where I point the Court, in

11   addition to the *Holder* case, which broadly is not a

12   defense friendly case but I think is a leading case on

13   this issue, is to what the Second Circuit said in

14   *United States v. Farhane*, 634 F.3d 127, quoting from

15   page 149.  This was a split decision.  And the defense had

16   grave concerns about even as far as the majority went in

17   terms of punishing attempt.  But what satisfies the

18   attempt requirement in that split panel's view, in the

19   majority's view, included this: "By coming to meet with a

20   purported al Qaeda member on May 20, 1995; by swearing an

21   oath of allegiance to al Qaeda; by promising to be on call

22   in Saudi Arabia to treat wounded al Qaeda members; and by

23   providing private and work contact numbers for al Qaeda

24   members to reach him in Saudi Arabia whenever they needed

25   treatment, Sabir engaged in conduct planned to culminate

1    in his supplying al Qaeda with personnel, thereby

2    satisfying substantial step requirement."

3           In that case, there is a direct link to

4    al Qaeda.  There are contact numbers exchanged.  There are

5    promises made to, at least it's purported, al Qaeda

6    members.  There is correct coordination and a path from

7    coordination to actually providing medical care.  Again,

8    you can imagine that I think the dissent has a better view

9    of all of this.  But even taking the majority's view, this

10   case a looks a whole lot different.  This, again, is

11   simply not a case where there is an ISIS connection.

12   There is, as the government alleges, a whole lot of

13   propaganda, a whole lot of ideological noise.  But there

14   just isn't any thread of communication, coordination, or

15   control.

16          So for those reasons, the government legally has

17   failed to allege facts that satisfy the proper elements of

18   18 U.S.C. Section 2339B.

19          THE COURT:  Thank you, Attorney Maguire.

20          Does the government -- you don't have to have a

21   response, but if you do, you're welcome to make one.

22          MR. MORABITO:  If I could, just briefly.

23          I think that a lot of what Attorney Maguire

24   indicated are things that may be assuming a grand jury

25   indicted Mr. Elshazly and the matter proceeded to trial

1    would be things he would argue to a jury about whether the

2    government could meet its burden beyond a reasonable

3    doubt.  I don't think the cases he's citing deal with the

4    probable cause standard; I could be wrong because I

5    haven't read them.

6              I think that, again, the complaint sufficiently

7    alleges that Mr. Elshazly believes he's under the

8    direction and control of ISIS because he indicates, again,

9    "our leader," in paragraph 19, "al-Baghdadi."

10             MR. MAGUIRE:  The government --

11             MR. MORABITO:  Can you hear me now?

12             MR. MAGUIRE:  Yes, thanks.  Sorry.

13             MR. MORABITO:  No problem.

14             I indicated that I believe were under direction

15   and control in paragraph 19 is a sufficient basis for a

16   finding of probable cause because, again, Mr. Elshazly

17   indicates "our leader," again al-Baghdadi, the leader of

18   ISIS, and what he should do on behalf of ISIS.

19             Paragraph 47, he indicates that he's willing to

20   build weapons or fight on behalf of ISIS.  I think, again,

21   Your Honor, that those two facts alone are sufficient for

22   a probable cause finding, but I think, in addition to the

23   other things I argued at the outset, I think at this stage

24   of the proceeding there is more than a sufficient basis

25   for the Court to make a probable cause finding.

1          I think other than that, Your Honor, I'm going

2    to just rely on my previous statements.  The only thing I

3    would say, Judge -- I apologize -- as far as attempts go,

4    again, I think, for purposes of a finding of probable

5    cause, the government has sufficiently alleged that

6    Mr. Maguire (sic) attempted to provide material support or

7    resources to ISIS.  Again, assuming the matter was

8    presented to a grand jury, that a grand jury indicted

9    Mr. Elshazly, that the matter proceeded to trial, maybe

10   Mr. Maguire has arguments he could make that the

11   government can't meet its burden beyond a reasonable doubt

12   as to the attempt element, maybe it could.  But I think

13   for purposes of this point in the proceedings, the

14   government has sufficiently alleged attempt by Ahmad

15   Elshazly.  Thank you.

16        THE COURT:  Attorney Maguire, you're welcome to

17   respond, if you'd like.

18        MR. MAGUIRE:  Thank you.  Just very, very

19   briefly.

20        The government has said that they believe

21   there's evidence that Mr. Elshazly believes he's under the

22   control of ISIS.  I may have gotten the quote slightly

23   wrong.  Again, I'll reiterate what I said.  I don't know

24   how the government gets there without any ISIS or any

25   coordination or communication whatsoever with ISIS.

1           THE COURT:  All right.

2           So let me just try to go through the law that

3   applies at a preliminary hearing, which I'm getting really

4   almost exclusively from the memo that the government filed

5   in this case.  And so let me go through that now.

6           We're at a preliminary hearing, and my sole task

7   is to determine whether there's probable cause to believe

8   that an offense has been committed and that Mr. Elshazly

9   committed it.  That's from Federal Criminal Procedure

10  5.1(e).  The "purpose of a preliminary hearing is to

11  'afford a person arrested upon complaint an opportunity to

12  challenge the existence of probable cause for detaining

13  him or requiring bail.'"  That comes from *United States v.*

14  *Cowan*, which is a Second Circuit case.  Courts routinely

15  apply this same probable cause standard when reviewing

16  complaints and search warrants.  "[P]robable cause

17  requires only a probability or substantial chance of

18  criminal activity, not an actual showing of such

19  activity."  That comes from *Bakhtiari*, another Second

20  Circuit case.  "Probable cause to arrest exists where the

21  officers have knowledge of, or reasonably trustworthy

22  information as to, facts and circumstances that are

23  sufficient to warrant a person reasonable caution in the

24  belief that an offense has been or is being committed by

25  the person to be arrested."  In the context of an arrest,

1    to establish probable cause, it is not necessary to make a

2    prima facie showing of criminal activity or to demonstrate

3    that it is more probable than not that a crime has been or

4    is being committed.  Rather, probable cause for arrest

5    exists where the facts and circumstances within the

6    officers' knowledge and of which they have reasonably

7    trustworthy information are sufficient in themselves to

8    warrant a person of reasonable caution in the belief that

9    an offense has been or is being committed.

10          And in evaluating probable cause, courts

11   consider the totality of the circumstances.  Under this

12   standard, courts must consider the whole picture rather

13   than viewing individual facts in isolation.  A probable

14   cause determination does not finally determine guilty

15   through a weighing of the evidence.  A magistrate judge

16   presiding over a preliminary hearing can "legitimately

17   find probable cause while personally entertaining some

18   reservation."  That comes from the *Coleman* case, which is

19   a D.C. circuit case.

20          So now what we do is turn to the elements of the

21   offense charged.  As we've talked about before, the

22   offense at issue here, which is charged in the complaint,

23   in violation of Title 18 U.S.C. Section 2339B, there are

24   three elements.  I'm simply paraphrasing here.  The first

25   is that the defendant knowingly attempted to provide

1    material support to a terrorist organization, a broader

2    statement covering organizations engaged in terrorist

3    activity.  The second element is that the defendant knew

4    that the organization was a terrorist organization, again

5    I'm paraphrasing.  And the third is that the defendant is

6    a national of the United States, the offense occurred in

7    the United States, and that it affected interstate or

8    foreign commerce.

9           And as Attorney Maguire has pointed out, there's

10   other subsections of the statute, subsection (h) indicates

11   that no person may be prosecuted under the term

12   "personnel" unless the person has attempted to provide a

13   material support to a terrorist organization, meaning that

14   if somebody is working independently, not for a terrorist

15   organization, does not fall within the definition of the

16   word "personnel."  Again, I'm paraphrasing here.  And

17   subsection (i) which essentially reminds everyone that the

18   protection the United States Constitution affords in the

19   First Amendment apply and so that somebody cannot be

20   prosecuted under the statute for exercising their

21   First Amendment rights.

22          First of all, I should ask either side, is there

23   anything I said about the law here that you disagree with

24   so far?

25          MR. MORABITO:  No, Your Honor.

1            MR. MAGUIRE:  Nor from defense.

2            THE COURT:  All right.  So we've heard the

3    testimony of Special Agent Evans.  We've also seen two

4    full exhibits, the complaint and the complaint affidavit.

5    Exhibit 1 is simply the complaint cover sheet, and

6    Exhibit 2, which is where we spent most of the time, is

7    the actual affidavit.  And the government's relying on

8    that affidavit in support of its contention that there is

9    probable cause to support the arrest here.  And so I will

10   go through each element.  I will do what the government

11   did and go in reverse order.

12           As to the third element, the one that we sort of

13   talked about last, the Court will make a finding that the

14   criminal complaint affidavit establishes probable cause

15   that the defendant is a national of the United States,

16   that the offense occurred within the United States, and

17   that the events that are described in the affidavit that

18   the offense affected interstate or foreign commerce.

19           First of all, paragraph 6 alleges the first

20   things that I just referenced about Mr. Elshazly being a

21   national of the U.S. and the offense occurring here.

22   Throughout the affidavit the events that are described

23   occurred within the United States.  There's also multiple

24   references throughout the affidavit to the use of online

25   applications that Mr. Elshazly uses when discussing his

1    intention to leave the United States and fight for ISIS

2    and also basically there's at the end of the affidavit a

3    description of him attempting to board a boat that would

4    travel to Turkey.  So the third element is that there's

5    probable cause to support the third element.

6            As to the second element as to whether the

7    defendant knew the organization was a terrorist

8    organization or was engaging in terrorist activity,

9    there's several paragraphs of the affidavit that have

10   information to establish probable cause for the second

11   element.  The complaint affidavit indicates at paragraphs

12   10 and 11, it identifies ISIS as a terrorist organization,

13   as an organization engaged in terrorist activity.

14   Paragraph 12 discusses the leader of ISIS and his death

15   and the new leader.  There's reference in paragraph 19

16   where defendant talks about "our leader," that's the

17   March 14th reference referencing a leader of ISIS and what

18   the leader of ISIS has told them to do, this is something

19   being recounted by the defendant.  Paragraph 20, the

20   defendant's group chat where the defendant leads a pledge

21   of allegiance to ISIS and the defendant is helping the CHS

22   to pledge allegiance to ISIS.  Paragraph 27 talks about

23   his desire to kill other individuals.  In paragraph 30,

24   continues the discussion about the death of the leader of

25   ISIS which was referenced earlier in the affidavit.  And

1    paragraph 33, he talks about what his life would be like

2    in Sham and that he wanted to be a killer for ISIS.

3    Paragraph 36 talks about the pledge of allegiance to the

4    new heir of ISIS.  All of these paragraphs, at least in

5    the Court's view, establish probable cause that the

6    defendant knew that ISIS was a terrorist organization or

7    an organization engaged in terrorist activity.

8           Finally, as to element one, which is really, I

9    think, the element that is the core of most of the

10   discussion that I heard on argument in the complaint

11   affidavit, which is whether Mr. Elshazly knowingly

12   attempted to provide material support to ISIS, the Court

13   will find probable cause that the complaint affidavit

14   establishes this element.  And in doing that, we certainly

15   can start at the end of the affidavit.  The affidavit --

16   give me one moment.

17          At the end of the affidavit, which is

18   paragraph -- really it starts -- really it starts earlier.

19   Let me just try to give a better -- paragraph 41, which is

20   taking place on December 6, 2019, CHS 2 meets with

21   Elshazly.  And Elshazly is being asked if he's ready to go

22   or not, and talking about how to get out of the

23   United States, how to get a ticket, how to buy a ticket,

24   if he's really sure he wants to go, which of course he

25   says he is.  And the next several paragraphs talk about a

1   number of things.  One of the things they talk about is

2   Mr. Elshazly's desire to leave the country and to fight

3   for ISIS.

4           In paragraph 47, Elshazly tells the CHS that he

5   brought two bags with him to the meeting, one duffle bag

6   and one backpack.  He asked if he could leave today, he

7   wanted to leave today, told him he was ready to go.  He

8   said, what would you do when you got there?  He said he

9   could make weapons, he'd design weapons, he could go

10  straight to Sham and start fighting.  If they don't need

11  me to build weapons, send me straight to Sham and I can

12  fight.  And he believed he was going to leave the country

13  that day; again, this is December 10, 2019.

14          And then in the paragraph 48, when presented

15  with the option to leave the United States to join ISIS by

16  plane or boat, Elshazly expressed concern about being

17  stopped at the airport, that he had a thousand dollars and

18  he researched ticket prices.  It sounds like for $722 that

19  he was worried that he'd be stopped and then he wouldn't

20  be able to do anything else.  And he was concerned that,

21  you know, he had sent a picture of his passport to someone

22  online who said they were in Sham and was fighting with

23  dowlah.  He was concerned that someone could have seen his

24  passport and that he would be stopped at the airport.  And

25  that if that happened, he wouldn't be able to go through

1    with joining ISIS.  And so he talked about taking a boat

2    and sneaking on a boat.  At that point they start talking

3    about traveling and leaving the country by boat.

4            And Elshazly sent the CHS a series of messages

5    informing him that he had made a decision to leave.

6    Quoting from the Koran, he has a quote about killing them

7    wherever you find them, expel them from whatever they've

8    expelled you.  It goes on longer in the affidavit.

9            Then he sends a series of messages asking if

10   he's had his I.D. checked with an airplane, he's still

11   considering how to leave, whether to go by boat or plane.

12           On December 13, 2019, he asks if he's leaving

13   tomorrow or just meeting.  He was asked to bring $500, and

14   he says he has it.  He asked how long the boat is going to

15   take, two months or two weeks.

16           On December 14th, he meets with the CHS, he

17   counts out $500, gives it to the CHS.  The CHS tells him

18   the money will be used to pay for transport on a fishing

19   boat that would take Elshazly to a containership that was

20   destined for Turkey.  Elshazly would be provided with an

21   employee badge on a containership, would work while on

22   board.  And they had further discussion about leaving his

23   vehicle in the parking lot, what to do with the keys.

24           And then finally, on December 15th, which is the

25   next day after having already paid the $500, Mr. Elshazly

1    arrived at the predetermined meet location and he

2    transfers his belongings, including two bags, into the

3    CHS's vehicle, he provides his vehicle keys to the CHS who

4    then drives him to a nearby marina that's used for

5    commercial fishing.  Upon arrival, the CHS points out the

6    person on the marina, who actually is an FBI agent, tells

7    Elshazly that will be the individual transporting him to

8    the shipping boat.  And Elshazly walks towards that person

9    with his belongings and is arrested.

10           And so all of that certainly establishes

11   probable cause that Mr. Elshazly was attempting to leave

12   the country to join ISIS.

13           In terms of how the affidavit sets forth

14   Mr. Elshazly's intention as has already been referenced

15   largely there through Mr. Elshazly's own words, there are

16   several paragraphs in which he himself talks about his

17   desire to fight as a martyr.  Paragraph 28 talks about him

18   explaining the meaning of jihad to the CHS.

19           There's this online messaging application that

20   Mr. Elshazly uses.  And in that online messaging

21   application, when he's communicating with individuals, he

22   talks about what he wants to do.  He says in paragraph 30

23   "I want to leave before I lose my chance To defend the

24   ummah."  And subparagraph 31 -- that was on October 28,

25   2019.  On October 30, 2019, he met with the CHS, met with

1  two different CHSs and spoke about traveling to join ISIS,

2  his concern that he did not want to be stopped at the

3  airport, he didn't want to die a hypocrite in the

4  United States.

5      Paragraph 32 continues to talk more about his

6  desire to leave and to fight rather than die here.

7      Paragraph 33 he talks about what his life would

8  be like in Sham and responds that he would be "a killer,

9  Inshallah," a killer for ISIS.

10      In paragraph 36, I mentioned before, he sent the

11  CHS a pledge of allegiance to the new leader of ISIS,

12  saying, "I pledge my allegiance... to the Khilafa of the

13  muslims" with the individuals named.

14      I should mention that in paragraphs 38 and 39,

15  he expressed some concern that people were -- he seemed to

16  be concerned about surveillance.  He talked about his

17  account being deleted and getting calls from numbers that

18  he didn't recognize from California.

19      And he continues talking about his online

20  messaging account being shut down in paragraph 40.

21      Paragraph 42, Mr. Elshazly sends one of the CHSs

22  a series of YouTube videos about how an AK-47 works, how

23  an M16 and AR-15 work, how a Colt M1911 works, an RPG 7

24  works, how a grenade works.  He sent a document entitled

25  "Guns & How They Work."  He talked about making their own

1    guns, talked about the advantage to making a gun with a

2    tapered barrel.

3           Paragraph 43, he sends videos on how a gyroscope

4    can be used to guide a rocket, a detailed discussion of

5    that video in paragraph 43.

6           In paragraph 45, this is now on December 10, he

7    comments to the CHS we can build this stuff, it's not that

8    hard.  We need easy access to materials, needs to be built

9    in Turkey where you can get the materials easily.  Once

10   the prototypes of whatever weapon they want to develop

11   were built, they would then smuggle it into Sham and test

12   it there.

13          And so, based on all of the paragraphs in the

14   affidavit, in particular the ones that I just referenced,

15   I find that the information presented at the probable

16   cause hearing does establish probable cause as to this

17   first element, and so that there is probable cause for all

18   three elements of the offense that's charged in the

19   complaint.

20          Let me ask the government first, is there

21   anything else the Court needs to do in terms of the

22   probable cause findings at this juncture?

23          MR. MORABITO:  No, Your Honor.

24          THE COURT:  And I understand the defense

25   objects.  I don't want to prevent you from articulating

1    any objection further before I turn to the next issue

2    which is the speedy trial motion.

3          MR. MAGUIRE:  We do object.  I don't know that

4    there's too much more to say.  I think the decision

5    ignores, in a sense, the *Farhane* -- or is inconsistent

6    with the standard expressed in *Farhane*.  That's what I

7    have.

8          THE COURT:  No problem.  Some of it was a

9    challenge, Attorney Maguire.  I don't recall seeing any

10   briefing from you on the -- for today, and so I tried to

11   follow your arguments, but I didn't have those cases in

12   front of me because I didn't have anything that you had

13   submitted on those.

14         MR. MAGUIRE:  Certainly.  And I think perhaps

15   the comments I would make is that I don't know that

16   there's a requirement that a ruling regarding probable

17   cause needs to be made immediately.  And so I would

18   point -- and I agree we didn't submit briefing on this.  I

19   would point simply to the *Farhane* decision and to the

20   Supreme Court's decision in *Holder v. Humanitarian Law*

21   *Project*, both of those cases I think are directly on point

22   and are worth independent examination.

23         THE COURT:  All right.  Well, you're free to

24   file anything you want.  I'm just telling you I didn't get

25   anything in advance, that's all.

1            All right.  Let's turn to the speedy trial

2    motion that Attorney Morabito has filed.

3            First, I think what it addresses is the issue

4    about a speedy indictment.  And I would turn first to

5    Attorney Maguire to ask if you have an objection to the

6    granting of this motion.

7            MR. MAGUIRE:  And this was also something that

8    was filed I believe it was yesterday.  So I have reviewed

9    it quickly, but don't have a fulsome response.

10            THE COURT:  That's okay, you don't have to.

11            What I was going to suggest is the following.

12    The speedy trial motion, from the government's

13    perspective, if the government could submit a proposed

14    speedy trial order.  I do have an order that I regularly

15    use, but obviously this is not the typical situation with

16    the COVID-19 pandemic, with the failure of a grand jury to

17    be seated during this time period.  I should point out

18    that just because the superseding general order that had

19    issued permits a grand jury being seated does not

20    necessarily mean a grand jury will seat, because obviously

21    you need a quorum of 16 grand jurors for there to be a

22    grand jury seated.  Until that actually occurs, it will be

23    impossible to know whether a grand jury is available.  But

24    it would be helpful to the Court if the government could

25    submit a proposed order that the government thinks would

1   be appropriate.

2          And then obviously, Attorney Maguire, if you

3   could respond in writing as to whether you object, or in

4   terms of the wording of the order if you object.

5          We do need to kind of move quickly on this.  I

6   recognize that it's a difficult time, but any time we're

7   dealing with speedy trial issues.  So I'd like the

8   government, if you could file that proposed order by

9   tomorrow.  And if, Attorney Maguire, you could respond by

10  Monday as to whether you object.  And if so, it could

11  either be that you don't object to anything, or you object

12  to the wording of the order, or you object to all of it.

13  Okay?

14          MR. MAGUIRE:  Sure.

15          And one thing that I will say that kind of gets

16  us into the next issue also is that I do think both the

17  landscape of whether the ends of justice warrant an

18  extension of the speedy trial deadline and also, frankly,

19  defendant's view on consenting to an extension may turn in

20  part on the question of release from detention.  So I

21  think these are somewhat interrelated in a way that I can

22  get into when we reach that.

23          THE COURT:  I plan to take up the motion for

24  release now.  I did review the motion.  Why don't you make

25  whatever arguments you'd like to make in support of

1    release.

2             MR. MAGUIRE:  Sure.

3             I think that certainly the Court is aware of the

4    general landscape of this case and, in particular, the

5    detention and release considerations from the prior

6    hearing.  I think the important changes that alter that

7    landscape, one, are the specific proposal regarding

8    Mr. Elshazly's father.  As noted previously,

9    Mr. Elshazly's father, who is on the line now, has always

10   been willing to be a third-party custodian.  Because his

11   aunt physically resides in Connecticut, we had previously

12   proposed her as a custodian.  In his prior order, the

13   Court indicated it did not view his aunt an appropriate

14   custodian.  So now we're explicitly suggesting that

15   Mr. Elshazly's father can, should, and is very willing to

16   serve as custodian.

17            One of the Court's expressed concerns regarding

18   Mr. Elshazly's father was that there was some information

19   about a prior incident in which police had been called and

20   in the order there was a suggestion or what seemed to be

21   the Court's understanding that Mr. Elshazly's father had

22   kind of attempted to deter him from a set of ideological

23   beliefs, that that had been unsuccessful.  And as set

24   forth in our written submission, Mr. Elshazly's father has

25   wanted to clarify that that is not the case, that when

1    Mr. Elshazly was about 18 years old there was what his

2    father understood to be a truancy issue, he stopped going

3    to school; that the father called essentially the school

4    resource officer who came to the house, spoke to the

5    younger Mr. Elshazly, and essentially told his father,

6    "Look, he's 18 years old, he doesn't have to go to

7    school."  There was no incident in which Mr. Elshazly's

8    father learned of ideological or religious beliefs and

9    attempted to intervene.  In fact, Mr. Elshazly's father

10   was not aware of these religious beliefs and at the time

11   Mr. Elshazly was predominantly living with his mother.

12   And so his father is someone who is ready and willing to

13   both impose his own conditions and to enforce conditions

14   set by the Court.

15          The other significant change that everyone is

16   aware of is the sudden onslaught of COVID-19.  As of I

17   think the last week, it's now confirmed at Wyatt the

18   number of confirmed cases is at least eight among the

19   inmates and I believe there's at least one confirmed

20   positive among staff members.  More are being tested and

21   so the numbers could well be much higher and should be

22   expected to grow.  Being detained right now is something

23   that looks very different for everyone, particularly for

24   people who have preexisting conditions or are older, but

25   for any member of the incarcerated population.  The

 1   heightened risk of contracting COVID is rightly very

 2   frightening and it should be frightening because it poses

 3   a very real health risk.  In the last week or so there

 4   have now been reports of severe strokes among very young

 5   people, as young as at least in their 30s.  And so that

 6   landscape is changed.  The idea that the community and

 7   Mr. Elshazly himself are safe in custody is turned on its

 8   head.

 9           And I think as well, with respect to this case

10   in particular, some of the concerns about, for example,

11   travel aren't the same as in a current context in which

12   travel is extremely restricted in which people are

13   generally fairly restricted to their homes.  Certainly in

14   this case a home incarceration order could be enforced

15   through GPS monitoring as well a prohibition on electronic

16   devices could be enforced as well by Mr. Elshazly's

17   father.

18           So I do think that both with respect to the

19   clarification regarding the cosigner and the other changes

20   from COVID, these are very changed circumstances.

21           I also note -- and I think that the Court

22   pointed out that this was a smaller concern -- but there

23   was a question of what action has Mr. Elshazly ever taken

24   that would be potentially harmful to other people.  And as

25   we heard in the course of the probable cause hearing,

1   there's no claim Mr. Elshazly is engaged in violence,

2   particularly violence on behalf of ISIS.  The government

3   at the prior hearing referenced some instances.  We wanted

4   to point out I think there were three instances, two of

5   them involved no contact or no conduct at all.  The third

6   one it appears that there was a misstatement.  The

7   government had suggested that Mr. Elshazly may have

8   attempted to ram a person with a shopping cart.  I think

9   the clarification, without going too much into discovery

10  materials, is that the source of that information was not

11  at all certain what was happening and, at any rate, that

12  it was a concern about Mr. Elshazly colliding with a

13  shopping cart.  Again, I understand the Court has said

14  that's a somewhat lesser concern.

15          But again, this is a case where Mr. Elshazly,

16  not to repeat all of the arguments from the prior hearing,

17  has no criminal history, he has supportive and in this

18  case a very strict parent who is willing to serve as

19  third-party custodian.  I'm not certain his aunt and his

20  mother may also be on the line as well, they continue to

21  be supportive and available as cosigners.

22          To briefly address the issue of the indictment

23  timeline, simply put, the government is suggesting that

24  the interests of justice warrant pushing this case down

25  the line.  And I think there may be logistical reality

1    that push any jury trial in this case quite far down the

2    line, and the government rightly raises health concerns

3    about jurors who would be in confined spaces.  And I think

4    there is even an unfortunate irony in suggesting it's

5    unjust that jurors should come into court and be close

6    together, but that Mr. Elshazly is placed in inherently

7    close and inescapable quarters.  I do think that the

8    question of whether justice permits and warrants extending

9    the time for trial here is different with Mr. Elshazly at

10   liberty or at very limited liberty in the community.  I'll

11   note I've spoken with Mr. Elshazly, he is willing to

12   consent to continuation of those deadlines provided he's

13   able to be home with his father.

14           I'm happy to answer other questions, I know this

15   is a topic that we discussed at length previously.

16           THE COURT:  Let me turn to the government.

17           MR. MORABITO:  Thank you, Your Honor.

18           The government still objects to release.  I

19   don't, candidly, other than -- and I'll address the

20   COVID-19 statements made by Mr. Maguire, but I don't think

21   anything's changed from the time or that addresses the

22   concerns raised by Your Honor at the detention hearing and

23   articulated both on the record and in the written order

24   that Your Honor prepared in that case.

25           I think that Mr. Elshazly is clearly a danger to

1     the community, based on the previous statements or

2     arguments made at his detention hearing in addition to

3     many of the statements Your Honor discussed today in

4     making a probable cause finding.  Again, not to belabor

5     the point, but he made statements where he wants to be a

6     killer for ISIS, "kill 'em where you find them," "kill the

7     kuffar."

8                I would note, Your Honor, that the government

9     stands by the statements made regarding information

10    regarding Mr. Elshazly's father.  The information that I'm

11    looking at -- I think Mr. Maguire has it -- indicates that

12    Mr. Elshazly, the defendant, indicated that his father

13    heard or someone told his father about various ISIS-type

14    statements and his father interjected.  I've never spoken

15    to Mr. Elshazly, the father.  I don't know whether or not

16    the defendant was boasting, whether it's true or not true.

17    What I know is what's been reported as the words of the

18    defendant.

19                I would note, Your Honor, there's further

20    information that the defendant considers his father,

21    again, "to be the kuffar," who has indicated because he

22    works, he pays taxes, he's Americanized.  Whether that's

23    true or not and what that means, I don't know, but I think

24    that is also indicative of the mindset of the defendant in

25    this case.  Because we know, again, from his own words,

1    what he thinks of the kuffar or what he believes to be the

2    kuffar.

3              I think that there's still the same concerns as

4    to flight that there were when Your Honor originally

5    issued the order of detention.

6              I would note that certainly the government is

7    cognizant of the COVID-19 problem here in Connecticut and

8    elsewhere.  Certainly the government is aware of what's

9    going on now at Wyatt -- and I don't mean to come across

10   as cold, Your Honor, because that's not how this is

11   meant -- but the fact of the matter is that Mr. Elshazly

12   is just not an appropriate candidate for release because

13   he is a significant danger to the community and he's a

14   very real flight risk based on his conduct that brings him

15   before the Court today.  The government is just not going

16   to agree -- and not that that controls what Your Honor

17   does, but the government just doesn't believe there are

18   any conditions available that will protect the community

19   from the defendant or will prevent him from potentially

20   fleeing.  Thank you.

21             MR. MAGUIRE:  And briefly I'll note, of course,

22   the government has been observing Mr. Elshazly since

23   September of 2018 which is a long time for him to be in

24   the community.  Again, there are no allegations of

25   violence.

1          I will note that I confirmed Mr. Elshazly's

2    father is on the Zoom call, he's willing to address the

3    Court if the Court wishes.

4          THE COURT:  Attorney Maguire, a couple of

5    questions.

6          First of all, I should say, for the record, I've

7    been involved in numerous bond hearings over the past,

8    well, I guess, six weeks, it feels like six years.  I'm

9    well aware of what's going on at Wyatt; we get daily

10   updates.  I've released several individuals due solely to

11   the COVID-19 pandemic, released them into home

12   incarceration both with and without the government's

13   consent.  So I'm fully informed of what's going on.  We

14   still have standards we have to apply.  If we had no

15   standards, Attorney Maguire, then what would be the reason

16   for anyone to be detained at Wyatt?  The Court still has

17   to apply the law, still has to apply to the Bail Reform

18   Act, and still has to apply, you know, where there's an

19   emergency or emergency circumstances.

20         So what I'm trying to understand is, if we just

21   focus for a moment on the COVID-19 pandemic, does he have

22   some medical issues that you want to present -- you can

23   certainly present them under seal -- that the Court should

24   know about?

25         MR. MAGUIRE:  Certainly.  And as I noted, there

1    certainly are people who statistically face greater risks.

2    At the moment there are not specific risk factors with

3    respect to Mr. Elshazly regarding COVID-19 that we would

4    put forth.  There are, as I've said, general COVID-19

5    concerns, and in this case more than others, I think, is

6    altered in terms of the landscape outside of custody by

7    COVID-19.

8              THE COURT:  The concern always,

9    Attorney Maguire, is the Court has to look not just at

10   what would happen if we were to release Mr. Elshazly, but

11   also as to what would happen if things don't go well.  One

12   of the reasons why I detained Mr. Elshazly is my belief

13   that he would not be able to abide by the conditions

14   imposed, and I certainly have that situation with other

15   defendants in far less serious cases.  And then the Court

16   is left with a very difficult problem because the last

17   thing in the world the Court would want to do is release

18   somebody from Wyatt, have them stay out for a period of

19   time and then go back into Wyatt after having been

20   released into the community; it creates a whole host of

21   health issues that we try to avoid if we can.

22              So I still have to look at Mr. Elshazly as an

23   individual and figure out whether there are individual

24   circumstances that would mean that leaving him

25   incarcerated at Wyatt creates a kind of emergency that the

1   Court should find outweighs all of the issues.  And I just

2   don't see that in his case.  Like I said, I'm well aware

3   of other cases.  I have another bond hearing in about 45

4   minutes where we're addressing this issue.  I'm well aware

5   of the issue and regularly do release individuals because

6   of their own individual health situations, but I don't see

7   that being the case here.

8          And I should say, you know, in preparing for

9   today's hearing, I had your motion which was quite

10  detailed and I went through it.  And then I went through

11  my detention order which was quite a bit more detailed

12  than I typically issue.  So going through the detention

13  order was helpful to me because if the reason for the

14  motion related solely to COVID-19, then I would simply

15  tell you that there's simply not enough support that you

16  provided to indicate why Mr. Elshazly should be released

17  for that reason.  But you obviously have other reasons for

18  seeking reconsideration, including primarily the fact that

19  his father has agreed to take him in, and the Court takes

20  that quite seriously, and the father wants to clarify

21  something about the last hearing which was that he didn't

22  know his son was involved or had the belief.  When I look

23  at my detention order, which I have in front of me and

24  which is on the docket -- I'm not going to read it out; I

25  wouldn't do that to the court reporter and I won't do that

1    to all of you.  But I can tell you that the Court's

2    reasoning for detaining Mr. Elshazly has very little to do

3    with this issue as to his father and parents knowing about

4    his beliefs or the police officer coming to his home.

5    What I will tell you is that the Court's reasoning for

6    detaining Mr. Elshazly related to the conduct that was

7    described, and I should remind everyone, not just in the

8    complaint affidavit at the time of the detention hearing,

9    a search warrant had been executed on his electronic

10   devices, and so we were talking about a lot more

11   information than was reviewed during the probable cause

12   hearing today.

13           So in the second paragraph of the Court's order

14   where the Court had concluded that the government had met

15   its burden of establishing by a preponderance of evidence

16   as to the flight and by clear and convincing evidence of

17   the dangerousness, the Court went through the defendant's

18   own words about his clear desire to kill other people on

19   behalf of ISIS and the fact that he had held himself out

20   as somebody who was computer savvy, who built computer

21   systems, could use encrypted applications, who has used

22   fake phone numbers and multiple SIM cards and often taught

23   others how to navigate computer applications to evade law

24   enforcement detection.  I went through the online chat

25   group that he led and the videos that he collected which

1   some of them we talked about during the probable cause

2   hearing, but these videos were disturbing and grotesque,

3   depicting the beheading of hostages, the drowning of

4   hostages, killing of hostages by sniper rifles, killing of

5   soldiers by the use of roadside bombs, dismembering of

6   hostages.  The defendant had warned others that these

7   kinds of acts of violence result when someone challenges

8   or goes against ISIS.  And there was a suggestion that his

9   own words were not meaningful or indicative of violent

10  behavior, and then we talked about these three instances

11  of where he had engaged with total strangers.

12          Quite frankly, the more significant issue for

13  the Court, far more significant, which I indicated in the

14  ruling, was that he made plans to take a boat to Turkey to

15  join ISIS in the fight.  So that his statements had

16  meaning and not just statements with no action, statements

17  with his own action paying the $500 and just about ready

18  to get on the boat.  And all these statements, of course,

19  he made to multiple individuals setting out his plans.

20          And then when we focus in on flight, you recall

21  I think at the original hearing you indicated, you know,

22  where is he going?  He doesn't have a passport,

23  he wouldn't get a passport, you know, he's now -- everyone

24  knows who he is, how could he go anywhere?  I think the

25  suggestion was this case was just a setup, he really had

1   no intention of going anywhere.  But that's just not borne

2   out in the affidavit.

3        And specifically the issue that I think I

4   focused on in the detention order was that in November of

5   2019 he indicated he believed somebody was watching him,

6   somebody was monitoring his actions, his movements.  This

7   was a significant issue for the Court.  He believed that

8   because a message application on his phone has been

9   deleted without his knowledge, he was receiving unknown

10  phone calls from California, and, you know, he was

11  concerned.  And this just heightened his actions.  He

12  talked about sleeping with a knife under his pillow, he

13  sent videos about these high-powered rifles, the creation

14  of high-powered rockets, researched international flights.

15  And so when he was worried about law enforcement, it

16  certainly did not cause him to stop; it only heightened

17  his actions.

18       When I talked about his background and

19  characteristics, I was focusing in on a couple of things:

20  the fact that he dropped out of high school in ninth or

21  tenth grade, had not held steady employment since that

22  time.  His mother had said he never held a job more than

23  two or three months, and the government had proffered that

24  he had been fired from his last job.  For several years he

25  had not worked or gone to school.

```
 1              In the ruling I indicated that there was
 2   evidence that both of his parents knew his actions in
 3   professing support for, and his commitment to, violence
 4   committed on Americans in Syria but did little to stop
 5   him.  Now I'm being told, well, his father didn't know
 6   that.  I guess my reaction to that, Attorney Maguire, is
 7   what's important to the Court is what I indicated in my
 8   ruling, which is that he left his father's home and
 9   returned to Connecticut.  So whatever happened down in
10   Maryland when the police officer visited his home, whether
11   it was because he wasn't attending school or because he
12   was doing something worse, is really not the relevant
13   issue to the Court.  The relevant issue is that when his
14   father tried to intervene, he left.  He came to
15   Connecticut, you know, to live with his mother.  And so
16   there's little evidence to suggest, at least to me, that
17   he would abide by either of his parents or his aunt.  In
18   other words, I think your original suggestion that he live
19   with another family member was because of your concern
20   that the Court might find it hard to place him with one of
21   his parents because that's where he had been living before
22   when the offense was occurring.  And so I think that was a
23   good argument you made going back to saying, well, I think
24   his father would be appropriate because now we are being
25   told the father had no idea.  That, to me, doesn't really
```

1    answer the question.  The question that I suggested in my

2    ruling was, well, you know, when his father tried to

3    intervene and so much so, tried to have a police officer

4    intervene, the defendant's reaction was to leave his

5    father's home and go back to Connecticut.  And of course

6    that's where the criminal activity alleged in the

7    affidavit occurred.

8         So for all the reasons that I set forth in the

9    original detention order, I don't think that you set forth

10   anything in your new motion which changes the Court's view

11   in this case.  I do think that if there was something that

12   would change the Court's view, it would be the COVID-19

13   pandemic, not potentially having his father serve as a

14   custodian.  And that could change.  I fully acknowledge

15   that things could change.  They change on a daily basis

16   with the pandemic.  As I sit here now, I don't see that

17   Mr. Elshazly satisfies what he would need to satisfy to

18   show that he's particularly vulnerable to the pandemic in

19   a way that we would need to release him from Wyatt.

20        MR. MAGUIRE:  Very briefly, with respect to his

21   father, I think it is worth at least clarifying, just so

22   it's on the record, the incident involving the school

23   resource officer was when Mr. Elshazly was about 18 years

24   old.  Subsequent to that, as you know, he's between his

25   mother and his father's house.  He did go back to

1   Connecticut, I'm not sure of the exact timing.  He then

2   returned to Maryland for a period of time, was living with

3   his father, almost completed his GED, and then his mother

4   suggested he return to Connecticut, which he did.  So

5   there's been back and forth, but it's not the case that

6   there was this incident, Mr. Elshazly left and never came

7   back to his father.

8           THE COURT:  Did he obtain his GED?

9           MR. MAGUIRE:  No.

10          THE COURT:  I mean, my point is that when his

11  father tried to get involved with the school resource

12  officer, the government's contention is the father tried

13  to get involved because the father knew he had these

14  beliefs and was starting to engage in behavior that

15  concerned the father.  Your point is that wasn't the case.

16  My point is I'm not sure it matters.  Because if the

17  father was trying to get involved to get him to go back to

18  school or to get his GED and he was not successful in that

19  endeavor, and in fact he was ignorant of what Mr. Elshazly

20  was doing, it's very hard for the Court to have confidence

21  that his father would be a good custodian who could

22  supervise him if he was released.

23          MR. MAGUIRE:  I share that concern.  Roughly

24  speaking, I think Mr. Elshazly was back and forth between

25  his mother and his father.  There are reasons why we did

1    not suggest his mother as a custodian as someone who would

2    be a disciplinarian, as someone who would notice what was

3    going on under her own roof.  We did initially indicate

4    Mr. Elshazly's father would be an appropriate custodian

5    but for the concern about him being out of state.  Part of

6    what would be the circumstances -- and this is something

7    that Mr. Elshazly's father had said -- is that part of not

8    having access to a phone, would not be in communication

9    with his mother, would not be getting kind of mixed

10   signals from two parents about what is -- sort of what the

11   rules are, that he would be entirely under his father's

12   roof and under his father's rules as well as the Court's

13   rules, again with no access to a phone.

14             THE COURT:  My point, Attorney Maguire, is

15   you're asking the Court to ask the United States Probation

16   Office to supervise a gentleman whose own parents couldn't

17   supervise and continue to be unable to, meaning the

18   suggestion that his mother not have contact with him is a

19   suggestion that her influence or her contact would somehow

20   be detrimental.  And that's a real problem for the Court.

21             So with that, I will stand by my earlier ruling.

22   I'll make clarification today to acknowledge the new

23   motion, and I'll rule on that and deny that request.

24             In terms of the speedy trial motion, I'd ask the

25   government to submit a proposed order by tomorrow, May 1.

1             And Attorney Maguire, if you could submit a

2   written objection by May 4 so that I can rule promptly on

3   the speedy trial motion.

4             Is there anything else we need to do with

5   Mr. Elshazly's case today?

6             MR. MORABITO:  Not for the government,

7   Your Honor.

8             MR. MAGUIRE:  Nor from defense.

9             I don't know what our timing is at Wyatt.  If

10  it's possible for me to have a brief breakout session with

11  Mr. Elshazly, I'd appreciate it.  But I understand if

12  we've run out of time.

13            THE COURT:  I will be happy to try to create

14  that.  What I will do is I will stay on the line, excuse

15  everyone else, you can leave the meeting, and we can go

16  off the record.

17                 (Proceedings adjourned at 12:28 p.m.)

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4      RE: UNITED STATES OF AMERICA v. AHMAD ELSHAZLY

5                   No. 3:19-MJ-1708(RMS)

6

7            I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages 1 through 93 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                    _____/s/_____

18                    DIANA HUNTINGTON, RDR, CRR
                        Official Court Reporter
19                    United States District Court
                       141 Church Street, Room 147
20                    New Haven, Connecticut 06510
                          (860) 463-3180
21

22

23

24

25